WILLIAM N. GURTMAN and IDA GURTMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent AARON SCHOMER and VIOLET SCHOMER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gurtman v. Commissioner
Docket Nos. 1077-73 1078-73
United States Tax Court
T.C. Memo 1975-96; 1975 Tax Ct. Memo LEXIS 275; 34 T.C.M. (CCH) 475; T.C.M. (RIA) 750096; April 8, 1975, Filed Kenneth G. Gordon, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The respondent determined deficiencies in the federal income taxes of petitioners William N. Gurtman and Ida Gurtman and petitioners Aaron Schomer and Violet Schomer for the taxable year 1967 in the amounts of $8,231.15 and $3,144, respectively. The sole issue for decision is whether an ordinary loss deduction is allowable under section 165(a) and (c), I.R.C. 1954, [1] for the loss of funds invested in a purported joint venture, or whether the aforementioned loss of funds gives rise to short-term capital losses under section 166(d). *277 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners William N. Gurtman and Ida Gurtman are husband and wife who, at the time of the filing of their petition herein, maintained their legal resident in Passaic, New Jersey. They filed their joint federal income tax return for the calendar year 1967 with the district director of internal revenue at Newark, New Jersey. Petitioners Aaron Z. Schomer and Violet Schomer are husband and wife who, at the time of the filing of their petition herein, maintained their legal residence in Clifton, New Jersey. They filed their joint federal income tax return for the calendar year 1967 with the district director of internal revenue at Newark, New Jersey. Ida Gurtman and Violet Schomer are parties hereto solely by reason of having filed joint returns with their husbands. Consequently, william N. Gurtman (hereinafter Gurtman) and Aaron Z. Schomer (hereinafter Schomer) will hereinafter sometimes be referred to as the petitioners. Gurtman and Schomer each owned 50 percent of the stock of Real Estate *278 Units, Inc. which in turn owned a 50 percent stock interest in Paterson Boiler & Tank, Inc. (hereinafter Paterson). Paterson was engaged in the business of manufacturing large boilers and tanks for industrial use. Gurtman, as January 1967, was the legal counsel for Paterson. Lawrence-Martin Associates (hereinafter Associates) was formed on or about January 16, 1967 and, until February 10, 1967, had as participants only Lawrence Gurtman, who was a cousin of Gurtman, and Martin Stern. Associates filed a certificate of business name, dated February 2, 1967, in the Office of the Clerk of the County of Passaic, New Jersey. On this certificate the nature of Associates' business was described as "Investments." On January 16, 1967, Associates entered into an agreement with Paterson which was described by the agreement as "a joint venutre agreement and arrangement." The introductory provisions of this agreement read as follows: WHEREAS, the Company [Paterson] is presently engaged in the business of manufacturing tanks and boilers and has on hand orders and contracts for the manufacture of such tanks and boilders and anticipates receiving additional orders and contracts for the manufacture *279 of tanks and boilers in the future; and WHEREAS, the Company lacks the necessary working capital to purchase the materials and to pay for the labor and other expenses required to assure the fulfillment and performance of said orders and contracts; and the Company has applied to the Associates for financial assistance, which assistance the Associates are ready and willing to furnish in accordance with the terms and conditions hereafter set forth. The substantive provisions of this agreement by paragraph thereof may be summarized as follows: (1) The parties thereto (Paterson and Associates) entered into a joint venture [2] arrangement for the manufacture of tanks and boilers covered by the orders and contracts mentioned in the above-quoted introductory provisions. Paterson would contribute the use of its plant and manufacturing facilities and Associates would contribute funds to assist Paterson in purchasing materials and in paying for the labor and other expenses required for the manufacture of such tanks and boilers. *280 (2) Paterson assigned to the joint venture all of its then uncompleted orders and contracts and all of its future orders and contracts received while the joint venture was in force and effect. (3) All the materials thereafter purchased by Paterson would be the property of the joint venture as would all the tanks and boilers manufactured or in process of manufacture while the joint venture was in force and effect. (4) Associates contributed $10,000 to the joint venture by a deposit to the account of Paterson in the Bank of Passaic and Clifton, which account, was by the agreement dedicated as the joint venture account. (5) Associates intended, from time to time, to contribute to the joint venture such sum or sums as, in its (Associates') sole judgment, the joint venture may require. However, Associates was to have no obligation to contribute any further funds (than the $10,000 acknowledged in the agreement as contributed). (6) The joint venture would be subject to termination by either party on 10 days written notice and upon such termination the joint venture would repay Associates the amount of the contributions made by it with the completed and partially completed orders *281 and controls being held by the joint venture until such contributions were repaid. The joint venture would then account to Associates for profits earned up to the date of such termination and would pay to Associates an equitable share of such net profits to be fixed and determined by the mutual agreement of the parties. If there was a failure to agree, the allocation of profits would be determined by arbitration as set forth in the agreement. (7) Paterson granted Associates the option to convert its interest in the joint venture into Paterson common stock. If the parties could not agree upon the basis of conversion, then such basis would be determined by arbitration as set forth in the agreement. Associates could exercise the option anytime before the expiration of 10 days after the termination of the joint venture. (8) Lawrence Gurtman was designated as the official and authorized representative of Associates in the administration of the joint venture. Associates reserved the right to expanded its participating membership without the requirement of approval of Paterson. All notices to Associates were to be sent in care of Gurtman & Schomer, Esqs. (9) Binding arbitration (in *282 a manner described but not relevant to the disposition of this case) was provided for any dispute or disagreement arising out of or by virtue of the agreement which could not be resolved by the parties hereto. Because they had no experience in the administration of the joint venture or knowledge of the value of their respective contributions thereto, the parties granted "the broadest possible powers" to the arbitrator or arbitrators. By written agreement dated February 10, 1967, Gurtman and Schomer agreed "to join as participants in [Associates] for the joint venture agreement with [Paterson] and for any other ventures or investments the said Associates may hereinafter undertake." According to this agreement, Gurtman and Schomer each agreed to contribute $12,500, for which each of them would have a one-sixth interest in Associates. Associates had no charter or written agreement, other than this February 10, 1967 agreement and the January 16, 1967 agreement, governing the relationship of its members to each other or to other parties. During the taxable year 1967 Associates did not engage in any activity other than advancing funds pursuant to the January 16, 1967 agreement, which *283 funds were used by Paterson. Petitioners' law firm kept ledger sheets which accounted for the transfer of money from Lawrence Gurtman, Martin Stern, Gurtman and Schomer to Associates and then to Paterson pursuant to the January 16, 1967 agreement. These ledger sheets had the caption "Lawrence Gurtman & Martin Stern-Associates" and the sub-caption "Paterson B&T-(Joint Venture)" written on them. The funds eventually used by Paterson were first deposited in the trust account of the law firm of Gurtman & Schomer. They were then transferred to the Bank of Passaic and Clifton account dedicated by the January 16, 1967 agreement as the joint venture account. When Paterson needed money it would draw on the latter account. This latter account in the Bank of Passaic and Clifton was Paterson's account both before and after the January 16, 1967 agreement was entered into. The name of this account was not changed and did not reflect the alleged joint venture. Whenever monies were placed in this latter account, except for one or two transfers when Gurtman was in the hospital, Gurtman would send Paterson a memorandum stating that Associates had advanced a certain amount of money under the joint *284 venture agreement (the January 16, 1967 agreement) which money was deposited in the joint venture account. Gurtman and Schomer each contributed $12,500, as agreed to in the February 10, 1967 agreement, and Gurtman contributed an additional $16,556.33. After the January 16, 1967 agreement was entered into, Paterson continued to conduct its sales, purchasing, and engineering activities in the same manner as prior thereto. The authority to enter into contracts with customers, on behalf of Paterson, continued in the same manner subsequent to the formation of the alleged joint venture as prior thereto. On May 5, 1967, Paterson filed a petition under Chapter XI of the Bankruptcy Act in the District Court, District of New Jersey. Gurtman and Schomer each filed a proof of claim, dated May 22, 1968, with that court. Gurtman and Schomer stated in these proofs of claim that Paterson was indebted or liable to them in the sums of $31,500 [3] and $12,500, respectively. These two proofs of claim stated the bases for the claims as follows: Lawrence-Martin Associates, composed of Lawrence Gurtman, Martin Stern, William N. Gurtman and himself [sic]; that claimant, as a member of this joint venture, *285 lent the Bankrupt [$31,500 and $12,500, respectively] and the entire sum of [$31,500 and $12,500, respectively] is still due and owing. Associates did not file a proof of claim in Paterson's bankruptcy proceeding. Paterson was adjudicated bankrupt on November 2, 1967. Neither Associates nor petitioners received any distributions from the bankrupt on the above-mentioned claims. Associates filed a federal partnership return of income for the year January 16, 1967 to December 31, 1967. This return showed a loss of $96,556.33. Of this amount $96,356.33 represents money advanced to Paterson by the participants of Associates pursuant to the provisions of the January 16, 1967 agreement. The remaining $200 of loss was attributable to "fees." Gurtman's and Schomer's shares of this loss were $29,056.33 and $12,500, respectively. No federal partnership return of income was filed on behalf of the joint venture. Gurtman and Schomer, in their federal income tax returns for the calendar year 1967, deducted $29,056 and *286 $12,500, respectively, which comprised their shares of Associates' claimed loss, as ordinary losses. In his notices of deficiency to petitioners, respondent determined that these claimed deductions of $29,056 and $12,500 resulted from nonbusiness bad debts and were to be treated as short-term capital losses. [4]
OPINION The sole issue for decision is whether an ordinary loss deduction, as petitioners contend, or a short-term capital loss deduction, as respondent determined, is to be allowed for the loss of funds invested in an alleged joint venture. Restating the basic facts briefly, on or about January 16, 1967, Lawrence Gurtman, who was a cousin of Gurtman, and Martin Stern formed Associates. On January 16, 1967 Associates executed a document with Paterson which was described as a joint venture agreement. On February 10, 1967 petitioners *287 Gurtman and Schomer joined Associates. Under the January 16, 1967 agreement Associates was to, and did, advance funds to Paterson. These funds came from the four participants in Associates. Paterson subsequently was adjudicated bankrupt. Neither Associates nor petitioners Gurtman and Schomer received any distributions from Paterson with respect to the claims filed against Paterson by Gurtman and Schomer in the bankruptcy proceeding. Petitioners contend that the allowance of an ordinary loss deduction under the provisions of section 165(a) and (c) (2)[5] is the correct way to treat the loss of funds in question because the losses were incurred in a transaction entered into for profit. Respondent, on the other hand, contends that these losses resulted from the worthlessness of nonbusiness debts arising out of loans made by petitioners in their individual capacities to Paterson. [6] Such losses, respondent asserts, are nonbusiness bad debts and deductible as short-term capital losses under the provisions of section 166(d). [7]
*288 Before reaching the substantive issue in this case, we must first consider respondent's objection made in his reply brief that petitioners raised the section 165(c) (2) argument, for the first time, on brief. It is well settled that issues not raised by the pleadings but raised for the first time on brief will not be heard by this Court. James G. Maxcy,59 T.C. 716, 728 (1973); Eleanor C. Shomaker,38 T.C. 192, 201 (1962). Cf. Estate of Akos Anthony Horvath,59 T.C. 551 (1973). Specifically, respondent asserts that the following prayer in the petitions in this case did not raise the section 165(c) (2) issue: * * * that this Court may try the case and allow the petitioners to deduct their loss in the joint venture as an ordinary loss deduction in the year 1967 and not as a short-term capital loss. Clearly section 165(c) (2) or the phrase "losses incurred in any transaction entered into for profit" or any facsimile thereof is not specifically mentioned in this prayer. However, as we read the above-quoted prayer, it would allow us to *289 reach any issue involving the loss arising from the transaction in question which would result in an ordinary loss deduction, including any section 165(c) issue. Respondent's course of action here, if any, would have been to move for a more definite statement. See Rule 51(a), Tax Court Rules of Practice and Procedure.
We perceive little difference between this part of the petition and those deficiency notices of respondent phrased in broad or ambiguous language. See Big "D" Development Corp. v. Commissioner,453 F. 2d 1365 (5th Cir. 1972), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 406 U.S. 945 (1972); Mills v. Commissioner,399 F. 2d 744, 748 (4th Cir. 1968), affirming a Memorandum Opinion of this Court. Furthermore, since respondent argued against the existence of a joint venture so vehemently in his opening brief, we think he must have realized the possibility that the finding of a joint venture would result in the loss' being considered as connected with it in some way. Turning now to the substantive issue involved herein, respondent argues that petitioners created a debtor-creditor relationship *290 between themselves and Paterson. This is so, respondent asserts, only because a joint venture did not in substance exist between Paterson and Associates for tax purposes. Respondent has not claimed, and we do not consider, that a valid joint venture was created but nevertheless that some part of the funds in question were loans, rather than contributions to capital, by partners or joint ventures to the partnership or joint venture. [8] Petitioners, on the other hand, contend that a valid joint venture did exist for tax purposes and that consequently the loss of the investment in that joint venture was incurred in a transaction entered into for profit. Petitioners contend alternatively that, even if the funds advanced to Paterson were loans, the loss could still be one incurred in a transaction entered into for profit under section 165(c) (2). Since we agree with petitioners, although we acknowledge that the question is a close one, that the funds were advanced to a joint venture with Paterson, we will not discuss petitioners' second theory. *291 In Beck Chemical Equipment Corporation,27 T.C. 840, 848-49 (1957), we defined a joint venture as follows: The legal relationship known as a joint venture has been defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation," and also as "an association or persons to carry out a single business enterprise for profit." [Citations omitted.] We also stated that the terms of such an arrangement could be informal and need not be in writing. Beck Chemical Equipment Corporation,supra at 849. The inquiry of whether, for tax purposes, a joint venture was formed presents a question of fact. The resolution of this question is to be arrived at by considering those same principles which govern the question of whether a partnership is to be accorded recognition for tax purposes. Hubert M. Luna,42 T.C. 1067, 1077 (1964); Beck Chemical Equipment Corporation, supra at 849. In deciding this question, we look to the Internal Revenue Code's *292 standards for qualification of an unincorporated association as a partnership rather than to the status of the arrangement under local law. Id.
The fundamental question to be answered is whether the parties intended to, and did in fact, join together for the accomplishment or conduct of an undertaking or enterprise. Hubert M. Luna, supra at 1077. See Commissioner v. Culbertson,337 U.S. 733, 741-42 (1949). To resolve this question, we must consider all the facts and circumstances in light of the factors, none of which alone is determinative, bearing on the issue. For a list of some of the factors involved, see Hubert M. Luna,supra at 1077-78, and Commissioner v. Culbertson,supra at 742. Considering all the facts in the record we conclude that petitioners advanced the funds in question through Associates with the expectation and intention of deriving a profit from the enterprise with Paterson by sharing in the proceeds of existing and future contracts and orders received by Paterson. We note here that certain of the traditional indicia of a loan, which respondent contends was the sole result of the transaction *293 in question, are not present here. There was no fixed maturity date or fixed rate of return for the advances. While we recognize that the joint venture agreement only mentioned a division of profits upon termination of the joint venture, we note that division and distribution of profits during the life of the joint venture was not ruled out by the agreement. As we read the agreement, it appears possible for Associates to seek a division of profits currently through arbitration if the joint ventures could not agree on the matter. In addition, we think the fact that the January 16, 1967 agreement did not set a fixed percentage of profits for Associates is reasonable in this case because the parties did not then know the total amount of contributions that Associates would make. In determining the basic question here of Associates' and Paterson's intents in the transaction we are particularly impressed by the fact that the lone original participants of Associates did not include the petitioners herein. There is no evidence, nor has it even been suggested by respondent, that petitioners' involvement in the enterprise was planned or anticipated. We think this fact and the fact that the *294 arrangement was referred to in the January 16, 1967 agreement, in Gurtman's memoranda to Paterson, and on the ledgers of petitioners' law firm as a joint venture distinguish the instant case from cases such as Lucia Chase Ewing,20 T.C. 216 (1953), affirmed on another issue 213 F. 2d 438 (2nd Cir. 1954). [9]
Respondent has pointed to several factors as showing that no joint venture existed for tax purposes. Among these are the facts that Paterson alone conducted the manufacture of the boilers, that Paterson did not inform its customers of the joint venture agreement, and that separate books and records of the operations of the joint venture were not kept. However, the presence of these facts does not prevent our finding that a joint venture did exist for *295 tax purposes. Beck Chemical Equipment Corporation, supra at 851-53, and cases cited therein. In fact, we see nothing to prevent the finding of a recognizable joint venture in appropriate situations where only one of the joint venturers conducts the operation of the enterprise. In situations where one joint venturer has no competence in managing the enterprise or does not have the time or inclination to do so (as we think is the case here), we think this solution only practical. In any case the January 16, 1967 agreement does not state that Paterson was to have exclusive control over the operations of the enterprise. In fact it provides that Lawrence Gurtman was the official representative for Associates in the administration of the joint venture, an indication to us that Associates was given the right to participate in the management of the enterprise. Respondent also points to the fact that no partnership return of income was filed on behalf of the joint venture. While the failure of the joint *296 venture to file a partnership return of income is some evidence of the intention of the parties, Lawrence Y.S. Au.,40 T.C. 264, 267 (1963), affd. 330 F. 2d 1008 (9th Cir. 1964), certiorari denied 379 U.S. 960 (1965), THE FACT THAT SUCH A RETURN WAS NOT FILED IS NOT CONCLUSIVE THAT THE ENTERPRISE WAS NOT A JOINT VENTURE. Lawrence Y.S. Au.,supra at 40 T.C. 267. See also Estate of R.L. Langer,16 T.C. 41, 47 (1951), affirmed per curiam 194 F. 2d 288 (9th Cir. 1952). Respondent claims that certain other facts tend to show that a joint venture was not created but that a debtorcreditor relationship was. Respondent states that Associates' ability to enlarge the number of its participants without the approval of Paterson negates the existence of a joint venture because there was in effect no voluntary association. However, as we read the January 16, 1967 agreement, Paterson had, as did Associates, an unlimited right to terminate the joint venture. For this reason, we think respondent's standard of voluntariness is entitled to no consideration in the instant case. Respondent next points *297 to the fact that Associates was given the option to convert its interest in the joint venture to common stock of Paterson. We see this right only as protection of Associates' equity position in the enterprise if Paterson decides to terminate the joint venture after its success. While, as respondent notes, the bank account in the Bank of Passaic and Clifton was Paterson's account both before and after the January 16, 1967 agreement was executed, that agreement did dedicate that account as the joint venture account. Respondent also stresses the fact that the joint venture, rather than Paterson, should have filed for bankruptcy. This is not so because the joint venture was not necessarily bankrupt just because it was dissolved on account of the bankruptcy of one of its joint venturers. After carefully considering all the facts contained in the record, we conclude, and so hold, that a joint venture existed for tax purposes between Paterson and Associates. Consequently the loss in question arose from an interest in the joint venture rather than from loans to Paterson. In contending that petitioners are entitled only to capital loss deductions by reason of their advances of funds to *298 Paterson, respondent argued that the joint venture between Associates and Paterson had no validity for tax purposes. Since we have concluded that there was in fact a recognizable joint venture, we assume respondent will not contest what appears to be the transparent conclusion, namely that petitioners are entitled to deduct their respective shares of the ordinary losses suffered by the joint venture. Decisions will be entered for the Petitioners.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and as applicable to the taxable year involved, unless otherwise indicated.↩
2. Use of the phrase "joint venture" in this summary or elsewhere in the findings of fact is not a finding of a joint venture for tax purposes by us but is only a restatement of the terminology used in the summarized agreement and other exhibits.↩
3. Gurtman was asked, but could not explain, why the amount claimed in his proof of claim exceeded the $29,056 claimed as a loss in this case. Nor can we explain it.↩
4. Respondent apparently included in the disallowance as nonbusiness bad debts petitioners' claimed distributive shares of the loss resulting from the $200 "fees" bad debts. No mention of any different treatment of the loss resulting from these fees has been made by the parties and we will not consider any such differing treatment herein.↩
5. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * * * (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and ***. ↩
6. In an amended answer, respondent asserted alternatively that the monies advanced to Paterson, through Associates, were contributions to the capital of Paterson by petitioners. Respondent has not pursued this argument on brief and we therefore consider it abandoned. ↩
7. SEC. 166. BAD DEBTS. (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
8. Section 761(a) provides that, for income tax purposes the term "partnership"includes "a * * * joint venture * * * through or by means of which any business, financial operation, or venture is carried on * * *." See also sec. 7701(a) (2) and sec. 301, 7701-3(a), Proced. & Admin. Regs. We note here that respondent has not argued that the alleged joint venture served no business purpose and thus should be disregarded for tax purposes. See Richard M. Cooper,61 T.C. 599↩ (1974). In any case, we view the instant case in a different light because here the joint venture was to conduct the business of Paterson and several persons unrelated to Paterson (Lawrence Gurtman and Martin Stern) received interests in the enterprise through Associates.
9. Respondent claims here that petitioners' claim of a "debt" (which Schomer testified was a misnomer) owed them by Paterson in the latter's bankruptcy proceeding shows that petitioners' intent was to make a loan. This after-the-fact characterization by petitioners (assuming it was an intended description when the claim was submitted) in Paterson's bankruptcy proceeding is taken as only that.↩