RICHARD T. HERRICK and REGINA W. HERRICK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Herrick v. Commissioner
Docket No. 12356-80.
United States Tax Court
T.C. Memo 1984-195; 1984 Tax Ct. Memo LEXIS 479; 47 T.C.M. (CCH) 1550; T.C.M. (RIA) 84195; April 18, 1984. William A. Cruikshank, Jr.,Stanford I. Millar, and MichaelAntin, for the petitioners. Michael C. Cohen, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year
Deficiency
1974
$19,023
1975
30,057
1976
14,644
The sole issue for decision is whether *480 payments made to petitioner, Richard Herrick, by Farmers Insurance Group in exchange for cancellation of petitioner's contract rights to overwrite commissions on a specialized insurance policy, developed by petitioner, constitute ordinary income or amounts received from the sale or exchange of a capital asset. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Richard T. Herrick (hereinafter petitioner) and Regina W. Herrick, husband and wife, resided in Los Angeles, California, at the time they filed their petition herein. They filed joint Federal income returns (Forms 1040) for the taxable years 1974, 1975, and 1976 with the Internal Revenue Service Center at Fresno, California. Prior to 1960, petitioner had accumulated extensive experience in the automobile dealer industry, particularly with General Motors dealerships. In or about September 1960, petitioner entered the insurance business. He was appointed as an insurance sales agent of Farmers Underwriters Association and its affiliates (hereinafter referred to as Farmers) by F. E. Woodbridge, who was a district manager for Farmers. At the time petitioner was appointed as a sales agent, *481 Leslie August (hereinafter August) was also an agent appointed by Woodbridge. At all relevent times, Farmers employed the following types of agents and district managers: local agents; district manager; originating agent; and originating district manager. A local agent is an insurance agent appointed by a district manager who earns commissions based solely on his own sales. A district manager is appointed by Farmers under a written agreement to train and supervise local agents. A district manager receives commissions based on sales made by local agents operating under his supervision. In general, in the event of the retirement, death, or permanent disability of a district manager, he or his personal representatives may nominate a successor. If none is nominated and accepted by Farmers within 30 days of notice by Farmers to do so, then the goodwill of the agency shall be purchased by Farmers in accordance with the formula based solely upon a multiple of the immediately preceding six-month service commissions (contract value). An originating agent is a local agent who develops a particular sales program such as a group policy, obtains a central group endorsement of the policy, *482 and receives compensation called an "overwrite commission." The overwrite commission is earned by the originating agent on sales of the particular policy by any other Farmers' agent. An originating district manager is a district manager for the originating agent who receives an overwrite commission from Farmers from all sales of policies developed by his originating agent. No contract value attaches to the originating district manager's overwrite commissions. Sometime during 1960 to June 23, 1961, petitioner and August conceived of what was then called "General Motors Dealer Policy Plan and Solicitation," (hereinafter known as the unitized program). The unitized program was a single insurance policy that covered all the insurance needs of an automobile dealer including such converage as liability, fire, theft, casualty, and workers compensation. This program was unique because of the rating system used to calculate the premiums. Using underwriting standards formulated by petitioner and August, premiums were calculated monthly based upon the dealer's gross receipts. Historically, premiums had been determined by using separate underwriting standards for each coverage. The program's *483 simplified method of premium calculation and consolidation of coverage under one policy substantially reduced a typical dealer's total insurance cost. In a letter dated June 23, 1961, Farmers agreed to develop a package for automobile dealers using the unitized program. The letter provided, in pertinent part: So far as underwriting is concerned, it was fully understood that the right to accept or decline a risk would rest with [Farmers] and the Regional underwriters, based on the conditions surrounding each individual risk and its past experience. * * * That if the arrangements work out satisfactorily with General Motors so far as their acceptability of our plan and the accessibility of their dealers as insureds, there will be a 2% overwrite paid on business produced by any representative of the Farmers Insurance Group, limited at the present time to the State of California. * * * Commissions will be paid to August and [petitioner] only so long as they are agents of record in good standing of the member companies in the Farmers Insurance Group. The regular Appointment Agreements will control this business as it does [sic] any other business. Specifically, renewals *484 and expirations are and will remain the property of the member companies of the Farmers Insurance Group. Further, in considering the value of the right of nomination under the contract of each of you the overwrite 2% commission above referred to will not be considered. The arrangement with General Motors that Farmers expected to work out prior to payment of the overwrite commissions was that petitioner would secure a General Motors endorsement of the unitized program.Although the endorsement never materialized, Farmers continued to pay petitioner and August the overwrite commissions.Petitioner and August were the only agents who received an overwrite commission without obtaining a central endorsement. In September 1963, petitioner and August formed an equal partnership and purchased Woodbridge's agency for $28,082. On September 1, 1963, Farmers entered into a district manager's appointment agreement with petitioner and August (hereinafter sometimes referred to as the 1963 agreement). This agreement generally set forth the relationship, rights, and duties between Farmers and the district manager. On that same day, Farmers, petitioner, and August executed an addendum to *485 the district manager's appointment agreement (hereinafter referred to as the addendum). The addendum set forth the contractual agreement of the parties concerning the unitized program. Under the addendum, petitioner and August received the exclusive right to sell the unitized program in Los Angeles County either directly or through their agents. In areas outside of Los Angeles county, petitioner and August were required to assist Farmers in promoting the sale of the unitized program, but they were prohibited from selling policies, either directly or through agents. Petitioner and August were also obligated to maintain contact with General Motors Corporation; process, field underwrite and rate all new business; maintain business records for the unitized program; and use their best efforts to educate company agents in the handling of the unitized program. In exchange, petitioner and August received the agreed two percent overwrite commissions for all policies written by Farmers in the unitized program. The parties referred to the two percent overwrite commissions as the originating district manager's overwrite commissions. On March 25, 1966, petitioner entered into a contractual *486 acknowledgement with Farmers which provided that effective April 1, 1966, petitioner would assume all contractual obligations previously entered into between petitioner, August, and Farmers. That same day, petitioner and Farmers entered into a new district manager's appointment agreement, effective April 1, 1966. This appointment agreement was similar in all relevant respects to the 1963 agreement. While the new agreement made no mention therein of the unitized program or the addendum, Farmers and petitioner continued to perform under the terms of the addendum. On March 31, 1966, petitioner purchased August's interest in the partnership for $52,938.50. On April 1, 1966, petitioner and Farmers executed a loan and sales option agreement, known as the California Marketing Plan. Under this plan Farmers would advance petitioner an amount not to exceed $20,000 for the purpose of expanding and promoting the sale of the unitized program throughout the State of California. Petitioner was obligated to repay Farmers one-half of the amount actually advanced. Pursuant to this plan, petitioner endeavored to expand the unitized program throughout the State of California. In this regard, *487 petitioner conducted market analysis, effectiveness studies, and undertook field underwriting through 1969. Farmers advanced petitioner the amount of $14,674.51 and, under a payback arrangement entered into on January 14, 1970, petitioner agreed to repay Farmers one-half of the amount advanced at the rate of $300 per month. From that date through January 18, 1974, petitioner continued his efforts to expand the unitized program throughout the State of California. The unitized program became successful and Farmers wanted to expand it into other states. However, the relationship between Farmers and petitioner was unique. Petitioner was the only district manager who could write insurance policies, and the only district manager who received an overwrite commission on a group policy without obtaining a central endorsement for the policy. Specifically, petitioner received a two percent commission on all policies written by Farmers in the unitized program without obtaining a central endorsement from General Motors. Farmers would not expand the marketing of the program into additional states unless it could acquire petitioner's right to receive the overwrite commissions. On January 18, 1974, petitioner *488 and Farmers executed an agreement whereby Farmers purchased from petitioner "certain contract rights under a District Manager's Appointment Agreement with [Farmers] and others which have been identified and referred to by [petitioner and Farmers] in past business transactions as originating district managers' overwrite commissions." In other words, Farmers acquired petitioner's right to receive the two percent overwrite commission on all policies written in the unitized program. In accordance with the provisions of this agreement, petitioner received and reported on the installment method the following cash payments for the calendar year described: Year
Amount
1974
$76,871
1975
121,638
1976
86,900
The contract price paid to petitioner was arrived at through an arm's-length negotiation and did not represent the present value of commissions as provided for in the district manager's appointment agreement. [1]
*489 During the years prior to 1974, petitioner reported all amounts he received by way of overwrite commissions on the unitized program as ordinary income on his Federal income tax returns. At all times mentioned, petitioner and Farmers did not file partnership returns with either Federal or state governments; petitioner was not liable for any losses suffered by Farmers; and Farmers retained the exclusive power to accept or decline any risk on the unitized program. On petitioner's Federal income tax returns for 1974, 1975, and 1976, petitioner reported the amounts received for the sale of his "contract rights" in the unitized program as long-term capital gain. In the notice of deficiency, respondent determined the amounts petitioner received from Farmers constituted ordinary icome. OPINION The primary issue for decision is whether the payments received by petitioner from Farmers for the sale of petitioner's "contract rights" in the unitized program constitute long-term capital gain or ordinary income. In their petition, petitioners alleged that the "rights * * * in the Unitized Program * * * constitute a capital asset which he acquired * * * by purchase from others * * *. *490 " On brief, however, petitioners' primary argument is directed toward the proposition that petitioner and Farmers were joint venturers, petitioner sold his interest in the joint venture to Farmers, and the amounts he received in 1974, 1975, and 1976, were taxable as amounts received from the sale or exchange of an interest in a partnership under section 741. [2]
Petitioners' argument is indistinguishable from the argument presented by the taxpayer in Luna v. Commissioner,42 T.C. 1067 (1964). In Luna, the taxpayer was entitled to receive commissions from Pioneer Life and Casualty as a result of formulating a new type of insurance policy which was later *491 sold by Pioneer. Several years after the taxpayer terminated his relationship with Pioneer, he received a lump-sum payment in exchange for cancellation of his contract right to continue receiving commissions on the policy which he developed. In Luna, as in the instant case, the taxpayer argued that he and Pioneer were joint venturers and that the amount he received was for sale or exchange of an interest in a partnership. In rejecting taxpayer's argument, this Court set forth the following factors, none being conclusive, which bear on the question of whether a joint venture exists between the two parties: The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation *492 in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise. [42 T.C. at 1077-78.] Applying the above factors to the record herein, we similarly conclude that petitioner and Farmers were not joint venturers. The relationship between petitioner and Farmers is outlined in the letter of June 23, 1961, and the addendum to the district manager's appointment agreement of September 1, 1963. According to these documents, petitioner, as an agent of Farmers, had the exclusive right to sell the unitized program within Los Angeles County and the right to receive a two percent overwrite commission on all policies written by Farmers in the unitized program. Undoubtedly, Farmers agreed to these conditions because petitioner formulated the program. Nonetheless, petitioner's only "contract rights" in *493 the unitized program were his exclusive right to sell the program within Los Angeles county and his right to the two percent overwrite commission; these rights are not indicative of a proprietary interest in the unitized program, or of a joint venture between petitioner and Farmers. Moreover, at all relevant times petitioner was under a district manager's appointment agreement with Farmers. In the addendum to the 1963 agreement, petitioner agreed to promote and sell the unitized program and to assist in training other agents to do the same. In exchange for his services, petitioner received an overwrite commission on all policies written by Farmers in the unitized program. These commissions were based upon gross premiums and in no way reflected a share of the profits Farmers was or was not making in the unitized program. Indeed, Farmers retained the exclusive right to accept or decline any risk because Farmers alone bore the risk of loss associated with issuance of the policies. In support of his position that a joint venture existed between himself and Farmers, petitioner points to the fact he was obligated to repay Farmers one-half of the monies advanced under the California *494 Marketing Plan. However, this factor alone does not establish a joint venture between Farmers and petitioner. Since petitioner's commissions rose commensurately with the number of policies written, it was in his own best interest to expand the marketing of the unitizing program. Indeed, both petitioner and Farmers were anxious to begin promoting the program in other states, but Farmers refused to expand the program beyond California until it acquired petitioner's rights to receive the overwrite commission. Finally, there is no evidence that petitioner or Farmers ever held themselves out as joint venturers, nor did they file Federal or state partnership returns. Having found that petitioner and Farmers were not joint venturers, we will discuss briefly petitioner's alternative contention that his "contract rights" in the unitizing program was a capital asset in his hands. In order to entitle himself to preferential capital gain treatment, petitioner must demonstrate that the gain was produced by the (1) "sale or exchange" of (2) a "capital asset." Sections 1221, 1222. Upon review of *495 the extensive case law interpreting the capital gain provisions, we find that petitioner did not satisfy either requirement and, accordingly, we must find for the respondent on this issue. Section 1221 defines capital asset as property held by the taxpayer which is not stock in trade, or property held primarily for sale to customers in the ordinary course of his trade or business, or depreciable property used in his trade or business, or certain other specific types of property. It is well-settled law that merely showing that a contract is property and is outside of the statutory exclusion does not qualify the contract as a capital asset. Commissioner v. Gilette Motor Transport, Inc.,364 U.S. 130, 134 (1960); Bisbee-Baldwin Corp. v. Tomlinson,320 F. 2d 929, 932 (5th Cir. 1963); Foote v. Commissioner,81 T.C. 930, 934 (1983), on appeal (5th Cir., Mar. 2, 1984). The right to receive future ordinary income does not change into capital gain by the mere receipt of a lump sum in lieu of future payments. Holt v. Commissioner,303 F. 2d 687, 691 (9th Cir. 1962), affg. 35 T.C. 588 (1961). As we stated *496 in Foote v. Commissioner,supra, "The central theme of the many cases denying capital gains treatment on the termination of such contract rights is that the payment received is essentially a substitute for ordinary income which would have been earned in the future." ( Foote v. Commissioner,supra at 935.) In the instant case, the "contract rights" in the unitized program purchased by Farmers consisted solely of petitioner's right to receive the two percent overwrite commission on all policies written in the unitized program. There is no evidence that petitioner transferred anything else to Farmers. After the transaction, petitioner remained an agent of Farmers and continued to receive the usual commissions under the district manager's appointment agreement for any policies which were written within his district; thus, petitioner retained any goodwill he may have developed with the automobile industry.[3] While the value of the right to receive the overwrite commission increased from the inception of the program through January 14, 1974, the nature of the right remained the same. Prior to 1974, the overwrite commissions petitioner received *497 clearly constituted ordinary income. The fact that petitioner received a lump-sum payment in lieu of future commissions does not change the nature of the right into a capital asset. Holt v. Commissioner,supra at 691; Foote v. Commissioner,supra at 935. Thus, we conclude that petitioner's contract rights in the unitized program do not qualify as a capital asset. Moreover, we are not convinced that there was a sale or exchange. In an arm's-length negotiation, petitioner merely settled for a lump-sum payment his claim for commissions to be paid in the future on all policies issued by Farmers in the unitized profram. In effect, this was an extinguishment of Farmers' obligation to pay the overwrite commissions.We think it is clear that in this case there was no sale or exchange. See Fairbanks v. United States,306 U.S. 436 (1939). *498 Petitioner's contract rights were not transferred to Farmers, they "merely came to an end and vanished." Foote v. Commissioner,supra at 936, citing Commissioner v. Starr Brothers, Inc.,204 F. 2d 673, 674 (2d Cir. 1953), revg. 18 T.C. 149 (1952). To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. The district manager's appointment agreement provided that in the event of termination of the relationship between the district manager and Farmers, Farmers could purchase the agency (including goodwill) for an amount not exceeding five times the district manager's service commissions paid to him during the preceding six month period.↩
2. Section 741 provides in pertinent part: In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751↩ (relating to unrealized receivables and inventory items which have appreciated substantially in value).
3. On brief, petitioner asserts that he transferred his goodwill that existed outside of Los Angeles County to Farmers. However, in the purchase agreement there is no mention of, or allocation to, goodwill. Moreover, at trial, petitioner failed to produce any evidence on the value of the goodwill allegedly transferred to Farmers.↩