THOMAS C. PRINCE and GLORIA L. PRINCE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Prince v. Commissioner
Docket No. 1791-71.
United States Tax Court
T.C. Memo 1973-31; 1973 Tax Ct. Memo LEXIS 256; 32 T.C.M. (CCH) 117; T.C.M. (RIA) 73031; February 7, 1973, Filed *256 Held, bad debt losses suffered by petitioner are nonbusiness bad debts under section 166(d). Perry Shields, for the petitioners. Richard J. Neubauer, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined the following deficiencies in the income taxes of petitioners: Year
Deficiency
Addition to Tax Sec. 6651 1966
$6,625.03
$662.50
1967
59.07
The deficiency for 1967 and the addition to tax for 1966 are no longer in issue. The only issue to be decided for 1966 2 is whether respondent correctly determined that deductions of $2,000 and $8,400 were losses from the worthlessness of nonbusiness bad debts under section 166(d). [1]
FINDINGS OF FACT
Some of the facts have been stipulated. These stipulated facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners are Thomas C. Prince, Jr., and his wife, Gloria L. Prince, who resided in Knoxville, Tenn., at all relevant times. Thomas C. Prince, Jr., shall be referred to as petitioner hereafter. Petitioners filed joint Federal income tax returns with the district director of internal *257 revenue, Nashville, Tenn., for 1966 and with the Southeast Service Center, Chamblee, Ga., for 1967. During the years in issue petitioner was a practicing physician whose specialty was surgery in Knoxville. During 1964 and 1965 petitioner's brother, Matthew S. Prince (Matthew) was licensed to practice law in Tennessee and was actively engaged in the practice in Knoxville. For sometime prior to 1965 petitioner was a shareholder in a corporation that was in the housebuilding business. This corporation went out of business without finishing a number of its houses. One of the former employees of this 3 corporation, James Turner (Turner), approached petitioner and Matthew to discuss the possibility of their forming another corporation to finish the houses. Turner wanted to do the construction work and thought that petitioner and Matthew could supply any money necessary. Turner was in no way related to either petitioner or his brother. As a result of Turner's discussions with petitioner and Matthew, P & T Builders, Inc. (P & T Builders) was incorporated in October 1965. Matthew and Turner each owned 50 percent of the stock of the new corporation. Upon the advice of Matthew petitioner *258 was not given any stock interest in P & T Builders; however, Matthew, Turner and petitioner agreed orally that petitioner would receive 50 percent of the net profits of the corporation in return for petitioner's arranging for financing for the corporation. Neither Matthew nor Turner had an adequate credit standing to secure construction loans for the corporation. The initial capital requirement of P & T Builders was $5,000. The source of the capital was $1,000 received from Matthew and Turner in the issuance of the capital stock and $4,000 borrowed from the Park National Bank of Knoxville, Tenn. P & T Builders issued a note to the Park National Bank for the $4,000. The note was dated October 5, 1965, and was due 90 days after that date. 4 The $4,000 note executed by P & T Builders was endorsed by petitioner, Matthew and Turner as guarantors. P & T Builders made no payments on the $4,000 note. In January 1967 petitioner was required to pay $2,000 of the $4,000 note. During the course of P & T Builders' operations petitioner was required to guaranty construction loans totaling as much as $300,000. At the time of trial about $14,000 of these loans were due and unpaid. Matthew's *259 only connection with the operations of P & T Builders was the rendition of legal services for which he was paid. In mid-1964 petitioner was approached by John Fales (Fales) to discuss the development of a tourist attraction located near Sarasota, Fla. This tourist attraction was called Floridaland West and was to consist of 15 to 20 concessions following various themes. Fales was interested in operating an authentic reproduction of a Seminole Indian village as one of the concessions. Petitioner and Fales had been acquainted for a number of years, and both were amateur archaeologists. Fales believed that if petitioner would lend him the money, he had the know-how to construct a replica of an Indian village. Petitioner spoke to his brother about Fales' proposal, and they went to Florida together to investigate the concession. Sometime after inspecting the Floridaland West 5 site petitioner, Matthew and Fales met at Fales' house in Sarasota to discuss the project. Matthew and Fales had not met each other prior to this meeting. At this meeting the parties agreed that a corporation would be set up to build and operate the concession and that petitioner would supply all the money *260 necessary to build the Indian village and put the concession in business. For his financial assistance petitioner was to receive 50 percent of the profits of the corporation, but at Matthew's suggestion it was determined that petitioner should not own any of the corporation's stock.The parties also agreed that Fales would receive a salary of $100 per week for building and running the concession and that he and Matthew would split the remaining 50 percent of any profits. None of these agreements was reduced to writing. Fort Everglades Indian Village, Inc. (the corporation) was organized to operate the concession. Petitioner received no stock in the corporation. Fifty percent of the corporation's stock was received by Matthew and fifty percent was received by Fales. The capital with which the corporation began business was $600, which the petitioner loaned to Matthew and Fales so that they might acquire the corporation's capital stock. Petitioner, Matthew and Fales were officers and directors of the corporation. Petitioner loaned money to the corporation 6 to get the concession started, and he continued to advance money to the corporation as needed in the course of its operations. *261 From October 27, 1964, to December 11, 1965, petitioner advanced $8,400 to the corporation. The corporation executed a note to the petitioner for each advance. The dates, interest rates, terms and amounts of the notes are as follows: Date
Interest Rate
Term
Amount 10-27-64
2%
Demand
$ 1,000
11-6-64
2%
1 year
500
12-4-64
6%
2 years
600
1-18-65
6%
2 years
900
3-30-65 *
6%
1 year
1,100
6-5-65
6%
60 days
400
12-11-65 *
4%
6 months
1,100
12-11-65 **
5%
90 days
3,200
The initial advances by petitioner were for the construction of the concession, the payment of Fales' $100 per week salary, and the initial purchase of supplies. Fales built the concession facilities with his own hands and with money furnished by petitioner. He used money furnished by petitioner to purchase materials and supplies. The concession was open for business by Christmas of 1964. Prior to the time the concession was open for business, petitioner had avanced to the corporation $1,000 on October 27, 1964, $500 on November 6, 1964, $600 on December 4, 1964, 7 and he had loaned Matthew and Fales $600 for the purchase of their capital stock, a *262 total of $2,700 capital furnished by petitioner before the concession was open for business. Other capital resources utilized to open the concession for business by Christmas of 1964 were in the form of 30-day credit from suppliers of souvenirs. On January 18, 1965, petitioner advanced $900 for a total of $3,600 furnished by petitioner by that date. The corporation purchased a Rambler automobile, the down payment of which was furnished by money from petitioner. The balance of the purchase price was concession operation. The corporation had no other sources of capital with which to begin business or to conduct its operations. Petitioner made advances and loans to the corporation as they were requested by Fales in order to continue the operations of the concession. Petitioner's role in the operation of the concession was limited to discussing with Fales the need for the various loans and advances. The corporation never made any profits, and on January 16, 1967, it sold the Indian village concession to Floridaland West for $1,200. The sales included all facilities constructed by the corporation and its inventory of souvenirs. The sale price was computed by reference to the unpaid *263 debts 8 of the corporation other than those owed to petitioner. The $1,200 was used solely to liquidate these debts, and petitioner received no part of this money. Petitioner has not received payment on the $8,400 of advances to the corporation which were represented by notes. OPINION
Petitioner is a surgeon practicing in Knoxville, Tenn. In 1964 and 1965 upon the advice of his brother, Matthew, who was an attorney, petitioner lent money and credit to two corporations. In one case petitioner guaranteed the notes of P & T Builders, a corporation engaged in the housebuilding business.The stock of this company was owned in equal parts by Matthew and a construction worker named Turner. P & T Builders failed, and in January 1967 petitioner was required to pay $2,000 as a result of his loan guarantees. In the other case petitioner lent money to a corporation involved in building and operating an amusement park concession in Florida. The stock of this company was owned equally by Matthew and an amateur archaeologist named Fales, who actually built and ran the concession. Of the numerous advances made by petitioner over a period of time $8,400 were represented by notes of the corporation. *264 This corporation also failed and in 1967 it sold its concession. Petitioner received none of the sale proceeds, and he has not received any payment on the $8,400 of notes. In both 9 cases petitioner was not a shareholder of the corporation, but he had oral agreements with the other shareholders of the corporations which entitled him to one-half of the profits earned by the corporations. Petitioner deducted the $10,400 that he lost in these two transactions as ordinary losses on his 1966 income tax return. Petitioner claims that he is entitled to deductions against his ordinary income because his losses were sustained in his trade or business under section 165(c) (1) or in a transaction entered into for profit under section 165(c) (2) or because they were business bad debts under section 166. Respondent claims that petitioner suffered nonbusiness bad debts under section 166(d) and that his losses therefrom are deductible as short-term capital losses. We agree with respondent. We believe at the outset that petitioner was engaged in no trade or business during the years in issue other than the practice of medicine. Petitioner does not claim, and it would not be plausible to find *265 upon the record, that the losses had any connection with his medical practice. Petitioner does claim that he was a member of two joint ventures with corporations and/or their shareholders which engaged in the housebuilding business and in the business of running an amusement park concession. If such joint ventures existed 10 and if they engaged in a trade or business, we would agree that petitioner would be considered to be engaged in such trades or businesses; however, petitioner's argument is at best farfetched upon the facts in the record. We have enumerated previously a number of factors to be considered in determining whether a joint venture exists. Hubert M. Luna, 42 T.C. 1067 (1964). In this case the only indicia of existence of joint ventures are petitioner's agreement to share profits with the shareholders of both P & T Builders and the amusement park concession corporation. Every other indicium of a joint venture is missing here. No partnership returns were filed by the alleged joint ventures and no partnership books were kept. Petitioner did not participate actively in either the house-building or concession business, and most importantly petitioner did not hold himself *266 out as a member of a joint venture. We think these latter two facts clearly distinguish the present case from the memorandum cases of this Court relied upon by petitioner. [2]
At trial petitioner stated that he entered into the two transactions in order to provide himself with a source of income for his retirement years. We think that this admission makes it clear that petitioner was merely investing in the two 11 businesses and that he expected to reap the benefits of the corporations' efforts. See Whipple v. Commissioner, 373 U.S. 193 (1963). We think that it is clear that the alleged joint ventures between petitioner and the corporations and/or their shareholders just simply did not exist. The remaining question to be decided is whether petitioner's losses are to be governed by section 165 or section 166. Spring City Co. v. Commissioner, 292 U.S. 182 (1934), established that the loss and bad debt provisions of the Code are mutually exclusive. Accordingly, the treatment of *267 the worthlessness of a debt is to be governed solely by the terms of section 166. In the case of the $2,000 which petitioner had to pay as a guarantor of a debt of P & T Builders, Putnam v. Commissioner, 352 U.S. 82 (1956), places petitioner's square within section 166. In the case of the $8,400 which petitioner advanced to the concession corporation and for which he received notes of the corporation, petitioner has not argued that the advances were something other than debt. Petitioner's arguments under section 165 were predicated upon our finding that the advances were incidents of his engaging in joint ventures. Neither party has argued that the notes represent stock rather than debt of the concession corporation although such a holding is conceivable upon the record. Accordingly, we hold that petitioner's losses from the unpaid advances to the concession 12 corporation are bad debt losses under section 166. In both cases the debts had no connection with any trade or business carried on by petitioner. Therefore, we hold that the losses incurred because of the worthlessness of these debts is deductible as short-term capital losses under section 166(d). In his notice of deficiency *268 and at trial respondent claimed that petitioner's bad debt loss in the transaction with P & T Builders were properly deductible in 1967 rather than 1966. Respondent did not renew this argument on brief, and respondent has not claimed that the debts to petitioner of P & T Builders and the concession corporation did not become worthless in one of these years. In view of the fact that petitioner took a maximum $1,000 capital loss deduction in both 1966 and 1967 from capital transactions not involved here, we need not determine in which year the debts became worthless. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩
*. Includes $100 interest; amount advanced was $1,000.↩
**. Includes $200 interest; amount advanced was $3,000. ↩
2. In A. L. Stanchfield, T.C. Memo. 1965-305↩, we found that taxpayer was a member of a joint venture because he took an active role in the affairs of the business and because he held himself out as a venturer.