KENNETH E. STRICKLAND and DELORES J. STRICKLAND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Strickland v. Commissioner
Docket No. 27104-83.
United States Tax Court
T.C. Memo 1986-85; 1986 Tax Ct. Memo LEXIS 520; 51 T.C.M. (CCH) 534; T.C.M. (RIA) 86085; March 4, 1986. Jack R. White, for the petitioners. Mark S. Priver, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Addition to Tax
Year
Deficiency
Section 6653(a) [1]
1979
$54,297
$2,715
1980
37,569
1,880
After concessions, the issues for decision are (1) whether petitioner entered into and participated in partnerships during the years in issue; (2) if not, whether certain amounts petitioner deducted as wages were reasonable compensation; and (3) whether *521 any part of the deficiencies were due to petitioner's negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Kenneth E. Strickland (petitioner) and Delores J. Strickland resided in Indio, California, at the time their petition was filed. They filed joint income tax returns for the years in issue. Petitioner has been associated with the gasoline service industry since 1937. Initially, he was employed as a manager of Union Oil Company of California (Union). He then leased and operated a Union service station as a retail dealer for approximately 16 years. In or about 1965, petitioner was employed as a salesman, delivery man, and manager of Coachella Oil Distributors (distributorship), a wholesale distributor of petroleum products of Union. After acquiring a 50-percent partnership interest in the distributorship in 1977, petitioner acquired complete ownership in 1978, as a sole proprietor. Peggy Kendrick (Kendrick) was employed as a bookkeeper for the distributorship in 1975. She was paid approximately $600 *522 per month. Kendrick remained with the company under petitioner's ownership and became the sole bookkeeper of the distributorship. She then worked approximately 40 to 45 hours per week, earned approximately $750 to $775 per month, and received an occasional $50 to $100 bonus. Petitioner considered Kendrick to be loyal, trustworthy, and diligent. In the Spring of 1978, petitioner was approached by two representatives of Union and asked to become a retail dealer. They requested that he lease and operate a station owned by Union and located on Interstate 10 in Palm Springs, California (the I-10 station). The current lessee had given Union notice of cancellation and was planning to close the station regardless of whether Union found a replacement. Thus, Union was desperately seeking another dealer/operator and appealed to petitioner because of his long association with Union and his prior experience in operating a service station. Petitioner was reluctant to take the station because it had strong competition and had been unprofitable for many years. Nevertheless, he believed that this favor to Union would benefit his distributorship and further that the station might persevere *523 with better customer relations and price competitiveness. Petitioner, however, did not want to keep the station's books and did not want the commitment of a bookkeeper's salary. Therefore, he spoke with Kendrick about the possibility of taking the station on a trial basis for a short period if they could work together. If she would agree to do all the bookkeeping, he would take care of the daily operations, and they would split the profits equally. Although he was uncertain that there would be any profits, petitioner hoped that they would each earn about $500 per month. Kendrick agreed, and without her participation petitioner would not have accepted Union's offer. In April 1978, petitioner signed a lease with Union wherein he agreed to operate the station as a self-service station over a 3-month trial period; Union waived the rent for 3 months and agreed to reimburse petitioner for a portion of the electricity bills. The station became profitable, and petitioner renewed the lease throughout the years in issue, retaining at all times the right to cancel the lease upon 90 days written notice. In November 1978, petitioner was again approached by the two Union representatives *524 who discussed the I-10 station with him. Because of petitioner's experience and his success with the I-10 station, they wanted him to lease and operate a self-service station located on Highway 111 in Indio, California (Highway 111 station). This station was already closed, and thus it posed an even greater gamble than the I-10 station. The competition was much stiffer, i.e., there were 12 stations within the area, and prior dealers of the Highway 111 station had gone out of business because of low sales volumes. Nevertheless, petitioner believed that the favor to Union might further benefit his distributorship. He did not want the management or the bookkeeping responsibilities, so he asked Todd Strickland (Todd), his 16-year-old son, and Kendrick if they would consider combining their efforts on a temporary trial basis. If Kendrick would agree to do the bookkeeping for the station, and if Todd would agree to manage and operate the station, petitioner would sign a 1-month lease, and they would divide the profits equally. Although he was uncertain there would be any profits, petitioner hoped that they would each earn a few hundred dollars per month. Todd and Kendrick agreed, and *525 without their participation petitioner would not have accepted Union's offer. Petitioner signed the lease for a 1-month trial period which, unless canceled, continued month to month. After several months, the station became profitable. Petitioner renewed the lease throughout the years in issue, retaining at all times the right to cancel the lease upon 90 days written notice. As before, the dealership did not pay rent to Union for the first 3 months. Although he rarely visited the Highway 111 station, petitioner spent approximately 2 to 3 hours a day managing the I-10 station. He supervised the ongoing operation and collected the money from a drop safe on the premises. He hired and fired all the employees and hired one employee who lived near the station to make sure the others showed up for their shifts, to go to the post office, and to go to the bank for change (the station always keep approximately $100 of change in the register). Todd spent approximately 25 hours a week managing the Highway 111 station. He opened and closed the station every day; took meter readings for each shift; helped employees do their checkouts; made sure the change fund was adequate; hired and fired *526 all the employees; and delivered the receipts and money to petitioner or Kendrick. In addition, Todd worked a regular shift as an attendant for which he was paid an hourly wage and eventually a monthly salary of $800. In addition to her full-time job at petitioner's distributorship, Kendrick did all the bookkeeping work for both the I-10 station and the Highway 111 station. The additional workload was much greater than Kendrick had anticipated. She worked on the stations' books every Monday through Friday from 5:00 p.m. until at least 10:00 p.m. and on weekends and holidays from 10:00 a.m. until at least 6:00 p.m. Although she received vacation pay, Kendrick never took a vacation. Only petitioner signed the leases to the two service stations. He did not initially consult an attorney or an accountant. Also, he did not inform Union of his arrangements with Kendrick and Todd because he believed, based on his experience with Union, that Union did not want to deal with "partnerships." During the years in issue, no written partnership agreements were executed nor were any partnership returns filed. Petitioner's certified public accountant was aware of the arrangements between petitioner, *527 Kendrick, and Todd but did not advise them that a written partnership agreement should be executed or that partnership returns should be filed. Each month during the years in issue Kendrick and Todd were paid their respective shares of the stations' net income for the prior month, and petitioner's shares remained in the businesses. His drawing accounts indicated monthly withdrawals that were substantially the same as the amounts paid to Kendrick and Todd. The amounts distributed varied from month to month depending on the stations' profitability, and when there were no profits in the first few months of operation, no one received any distributions. The amounts paid to Kendrick and Todd were recorded by Kendrick in the respective station's books as payroll from which withholding and FICA taxes were deducted. Petitioner paid employer payroll taxes on these amounts. At the close of each taxable year, petitioner's certified public accountant would calculate the stations' net profits for the year and determine Kendrick's and Todd's distributable shares of those profits. Accordingly, Kendrick would adjust their distributions in the subsequent year to reflect their appropriate shares *528 for the prior year. These adjustments primarily reimbursed petitioner for payroll taxes paid on Kendrick and Todd during the prior year; hence, distributions to Kendrick and Todd in the first few months of each year were smaller than petitioner's shares. A nationwide gasoline shortage, which was not anticipated by petitioner, Kendrick, or Todd, began in or about March 1979 and lasted throughout the years in issue. During the shortage, the stations' profit margins per gallon of gasoline increased dramatically. For example, the I-10 station earned a gross profit [2] of approximately 5 to 9 cents per gallon in 1978, an average of 13 cents per gallon and as much as 15 cents per gallon in 1979, and 16 to 17 cents per gallon in 1980; the Highway 111 station reported similar profit margins. Also, because the stations were required by Union to operate for shorter periods than before the shortage, the general overhead costs of operation declined. As a result, the stations were highly profitable. The I-10 station's books reported net income of $7,672 in 1978 (before the shortage), $48,708 in 1979, and $43,321 in 1980; the Highway 111 station's books reported a net loss of $213 in 1978 (before *529 the shortage), net income of $24,810 in 1979, and net income of $17,230 in 1980. [3] After the gasoline shortage ended, the profit margins and net earnings of both stations declined. In 1982, petitioner changed certified public accountants. When informed of the arrangements between petitioner, Kendrick, and Todd, the new certified public accountant advised petitioner to execute written partnership agreements and to commence filing partnership returns. On November 30, 1982, both partnership agreements were duly executed, and partnership returns were filed for an initial period of July 1, 1981, through December 31, 1981. The partnership agreements note that they reflect the terms of oral partnerships entered into in January 1979. In his notice of deficiency, respondent disallowed a portion of the total wages deducted on Schedules C of petitioner's tax returns during the years in issue on the ground that they were unreasonable compensation to Kendrick and Todd. *530 The amounts paid to Kendrick and deducted as wages by petitioner are summarized as follows: Kendrick
Distributionship
Highway 111
Year
Salary
I-10 Station
Station
Total
1979
$9,493.75
$47,208.45
$22,690.56
$79,392.76
1980
9,493.75
43,895.68
17,319.68
70,709.11
Of the amounts in the total column, respondent determined that only $21,000 in 1979 and $25,200 in 1980 were reasonable compensation and therefore deductible. The amounts paid to Todd and deducted as wages by petitioner are summarized as follows: Todd
Highway 111
Station
Distributorship
Hourly Wages/
Highway 111
Year
Hourly Wages
Salary
Station-Other
Total
1979
$606.00
$4,182.29
$21,846.24
$26,634.53
1980
2,150.00
7,300.69
16,611.14
26,061.83
Of the total amounts paid to Todd from the Highway 111 station, respondent determined that only $6,285 in 1979 and $12,480 in 1980 were reasonable compensation and therefore deductible. OPINION Petitioner contends that he entered into partnerships with Kendrick and Todd and that, on Schedules C of his returns for the years in issue, he should never have included *531 in gross receipts, nor deducted as wages, any of Kendrick's or Todd's respective shares of the partnerships' profits. Alternatively, if we find that no partnerships existed, petitioner argues that the amounts deducted as wages to Kendrick and Todd were reasonable compensation for services rendered. Respondent argues that no partnerships existed for tax purposes; that the amounts petitioner deducted as wages to Kendrick and Todd were unreasonable; and that the deficiencies attributable to the disallowed wage deductions were due to negligence or intentional disregard of rules and regulations. Section 7701(a)(2) defines a partnership as follows: a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation * * *. Petitioner bears the burden of proving that he entered into partnerships that will be recognized for Federal tax purposes. Welch v. Helvering,290 U.S. 111 (1933); *532 Rule 142(a), Tax Court Rules of Practice and Procedure.
The determination of the existence of a partnership is purely a question of fact. Commissioner v. Culbertson,337 U.S. 733, 742-743 (1949). In Commissioner v. Tower,327 U.S. 280, 286-287 (1946), the Supreme Court stated: A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses. When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their "agreement, considered as a whole, and by their conduct and execution of its provisions." Drennen v. London Assurance Company,113 U.S. 51, 56; Cox v. Hickman, 8 H.L.Cas. 268. *533 We see no reason why this general rule should not apply in tax cases where the government challenges the existence of a partnership for tax purposes. * * * [Fn. ref. omitted.] In Tower, holding that no partnership existed between a husband and wife where the facts failed to reveal the requisite intent, the Supreme Court stated that a husband and wife may enter into a partnership so long as each contributes any or all of the following -- capital, management and control, or services. Commissioner v. Tower,327 U.S. at 290. In Culbertson, the Supreme Court extended its discussion in Tower to an alleged partnership between a father and his sons and reiterated that the question simply concerned "whether, considering all the facts * * * the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Commissioner v. Culbertson,337 U.S. at 742-743. Both parties rely on Tower and Culbertson as setting forth the criteria to be applied here. Based on our consideration *534 of all the facts herein, we find that petitioner, Kendrick, and Todd entered into bona fide partnerships for the purpose of operating the two gasoline stations. Petitioner testified that he did not anticipate the gasoline shortage and the resulting high profits of the two stations. Rather, he undertook operation of the stations primarily because it might benefit his distributorship to do Union this favor. Because of the historic losses and other problems associated with the two stations, however, he would not commit himself to a substantial capital outlay. Also, he did not want the responsibility of bookkeeping, the commitment of a bookkeeper's salary, or the responsibility of managing a second station. Thus, he approached Kendrick and Todd with the idea of partnership arrangements. Petitioner, Kendrick, and Todd testified that they agreed to join together and operate the service stations as partners. For the I-10 station, petitioner contributed the leasehold/dealership and management services; Kendrick contributed the bookkeeping services; and they agreed to share the profits equally. For the Highway 111 station, petitioner contributed the leasehold/dealership; Kendrick contributed *535 the bookkeeping services; Todd contributed management services; and they agreed to divide the profits into equal shares. The services offered by Kendrick and Todd were valuable contributions to the partnership, and petitioner would not have signed the leases for the stations without their participation. Petitioner also testified that he did not want to inform Union of the partnerships because, based on his experience and knowledge, Union did not look favorably on station partnerships. Hence, petitioner, Kendrick, and Todd concealed the partnerships from Union. Initially, the stations incurred losses, and as a result, neither petitioner, Kendrick, nor Todd received any distributions in return for their services or other contributions. During the ensuing period of profitability, the parties received their respective shares of a month's profits in the subsequent month, after Kendrick had computed that prior month's net income. Kendrick and Todd received their shares in the form of salaries, and petitioner withdrew a corresponding amount from his drawing account for each station. The distributions were not always identical: Kendrick's and Todd's shares, treated as salaries, were subject *536 to withholdings. Also, because petitioner paid payroll taxes on Kendrick and Todd, their salaries for the first few months of any taxable year were adjusted effectively to reimburse petitioner for the payroll taxes paid the prior year. These detailed calculations, on a monthly basis and particularly at the close of each year, are persuasive evidence that a partnership existed on the terms described by petitioner, Kendrick, and Todd. Our findings of fact are based largely upon the testimony of petitioner, Kendrick, and Todd, all of whom we had the opportunity to observe at trial.Based on their candor and consistency, we believe them. Respondent's cross-examination failed to undermine the credibility of petitioner and his witnesses, and respondent did not introduce evidence that would "elevate his suspicions into our convictions." [4] Further, the stations' records admitted into evidence are consistent with the testimony at trial, particularly regarding the computations to determine the respective shares and the entries designed to conceal the partnerships from Union. *537 The written partnership agreements executed subsequent to the years in issue state that their terms reflect the oral partnership agreements entered into in January 1979. Although this date is subsequent to the dates petitioner argues that the partnerships were organized, it does not persuade us, in view of the credible testimony and corroborating records of both stations, that the partnerships were not formed in April and November 1978, respectively, and that no partnerships existed during the years in issue. Respondent argues that an application of what he calls the factors considered significant in Luna v. Commissioner,42 T.C. 1067 (1964), would result in a determination that no partnership existed here. Respondent's application of Luna is wrong. Luna presented facts substantially different from those before us here. When a factfinder makes its determination of a taxpayer's intent based on a consideration of the facts, the emphasis or significance will certainly vary from case to case, and one such case is not bound by the significant facts of another case. The taxpayer in Luna entered into a contract with an insurance company to manage a specific *538 territory in return for certain commissions. When he terminated that relationship and treated his remaining commission payments as capital gains, respondent determined, and we agreed, that their proper characterization was ordinary income. We held that, on those facts, taxpayer's agreement was an employment contract and that therefore the parties did not intend to create a joint venture (partnership). The facts here, on the contrary, indicate that the businesses would never have commenced operation without Kendrick's and Todd's participation as bookkeeper and manager, respectively. Furthermore, they agreed to, and approximately did, share the profits equally with petitioner. On brief, respondent provides a list, including many facts, in support of his argument that no partnership existed. These facts and even the combination of these facts fail to convince us that a partnership did not exist. A partnership agreement may be entirely oral and informal. Ayrton Metal Co. v. Commissioner,299 F.2d 741, 742 (2d Cir. 1962); Seattle Renton Lumber Co. v. United States,135 F.2d 989, 991 (9th Cir. 1943). *539 The failure to file partnership returns does not prevent recognition of a partnership for Federal tax purposes. Ayrton Metal Co. v. Commissioner,supra.That the parties concealed the partnerships, that the dealerships were operated in petitioner's name only, that all sums to Kendrick and Todd were treated as wages or salary, and that these sums were deducted from petitioner's gross income as wages and compensation have all been satisfactorily explained by credible testimony. Also, that petitioner was the only contributor of capital is immaterial because the other partners contributed management and control or other services. See Commissioner v. Tower,supra.
Because we hold for petitioner on the partnership issue, we do not address the other issues. To reflect concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. In this context, gross sales price per gallon minus cost per gallon. ↩
3. These figures reflect net income or loss after Kendrick's and Todd's shares of the profits have been deducted as wages on the stations' books.↩
4. See (in another context) Ellis v. Commissioner,T.C. Memo. 1985-511↩, slip opinion page 21.