HUBERT M. LUNA AND BENNIE I. LUNA, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2702–62. Filed September 18, 1964.

*Sam C. Pointer, Jr.,* and *F. R. Ingram,* for the petitioners.
*Glen W. Gilson II,* for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioners' income tax for the taxable year 1959 in the amount of $10,044.91.

The only issue for decision is whether the amount of $45,000 received by petitioner Hubert M. Luna (hereafter sometimes referred to as petitioner) from Pioneer Life & Casualty Co., Inc. (hereafter referred to as Pioneer), in 1959 as consideration for the release of rights to which petitioner was entitled under a contract with Pioneer, constituted capital gain or ordinary income.

Petitioner offered no evidence with respect to, and does not mention on brief, another issue, originally raised in the pleadings, relating to a deduction for depreciation of an automobile and that issue is deemed abandoned by petitioner.

An adjustment decreasing the deduction for medical expenses allowable to petitioners in 1959 depends solely upon the amount of petitioners' adjusted gross income which, in turn, depends upon the resolution of the principal issue here involved, as does an issue relating to petitioner's liability for self-employment tax.

FINDINGS OF FACT

Petitioners are husband and wife residing in Birmingham, Ala. They filed a joint Federal income tax return for the taxable year 1959 with the district director of internal revenue, Birmingham, Ala.

Petitioner became an insurance agent during World War II. He was an agent for Life Insurance Society of America in Birmingham, developing unique types of life insurance policies and forms of insured investments, until 1951 when he became vice president of Columbus National Life Insurance Co., Columbus, Ga. He resigned this position and was selling insurance as an agent in 1952 when he had occasion to deal with Pioneer about a matter in which several of his friends were interested. Petitioner dealt with B. L. Carter and Earl Lebo (hereafter referred to as Carter and Lebo), president and vice president, respectively, of Pioneer, which was a stock company licensed to do business in seven States in the southeast.

In the course of petitioner's dealings with officers of Pioneer it was suggested that he become associated with Pioneer to expand its business by the promotion of a special policy conceived by petitioner. Based on his familiarity with other policies then being sold which were somewhat similar in function but different in detail, petitioner had worked out a policy combining life insurance and investment features. This policy provided that the policyholder would pay premiums for a period of 15 years. The first year's premium would be used to pay the agent's commission; thereafter 40 percent of premiums paid by the policyholder would be deposited in a fund which would be invested by the insurer. The remaining portion of premiums paid by the policyholder would pay for life insurance for the policyholder; in the event of the insured's death during the period of coverage, not only would the face amount of the insurance be paid, but amounts would be deposited to the investment fund in behalf of the policyholder for the remaining portion of the 15-year period as if the insured had lived and continued paying premiums. At the end of the 15-year period a policyholder (or his beneficiary if he had died) would be paid his share of the investment fund, less a 10-percent fee paid to

the insurer for handling the fund. The insurer would guarantee that a certain percentage of the premiums paid would be paid the policyholder or his beneficiary at the end of the period from the investment fund, the percentage depending on the age of the policyholder. Petitioner worked with an actuary in developing this policy.

Pioneer was interested in writing this policy and in acquiring petitioner's services in building up a sales force to promote it. Pioneer had its actuary review and approve the computations and policy form prepared by petitioner's actuary. Petitioner began selling the policy on behalf of Pioneer on a commission basis on or about May 15, 1952. Petitioner was entitled to $1,000-a-month advance against his commissions earned. Pioneer paid some expenses of obtaining permission of State insurance commissions for sale of the policy, and also shared with petitioner other expenses such as counsel fees.

Under date of July 18, 1952, Carter wrote petitioner as follows:

Effective May 15, 1952, your first year commission on personal production in connection with the sale of the new 15 Year Fund Policy is 95%, and your renewal commission, if you qualify for renewal commissions, on personal production will be 8% of the regular premiums, paid for the second year to the fifteenth year inclusive, except that no renewal commissions will be paid on that portion of the premium deposited in the Fund each year.

Your first year override commission on first year premiums of the 15 Year Fund Policy will be the difference in the first year commissions paid to General Agents and your first year commission of 95%.

Your override renewal commission, if you qualify for override renewal commissions, will be 3% of the regular premiums, paid for the second year to the fifteenth year inclusive, on the 15 Year Fund Policy, except that no override renewal commission will be paid on that portion of the premium deposited in the Fund each year.

Your renewal commissions herein specified shall not be paid, provided you and all other persons writing the 15 Year Fund Policy shall fail to procure for the Company in any 12 months period, as much as $3,000,000.00 of insurance delivered and paid for.

If you continue to represent the Company continuously for three years from this date, or after $7,500,000.00 of the 15 Year Fund Policy is in force on the books of the Company, whichever comes first, the renewal commissions specified shall be paid to you, if living, otherwise, to your wife, if she be living, for the term of years specified above.

$1,000.00 placing credit will be allowed for each unit of $50.00, $60.00 of [sic] $70.00 annual deposits on the 15 Year Fund Policy.

If you leave the services of the Company, by resignation or dismissal for cause before the expiration of the aforesaid three years continuous service, or before $7,500,000.00 of the 15 Year Fund Policy is in force on the books of the Company, whichever comes first, then no further renewal commissions on the 15 Year Fund Policy shall be payable to you by the Company.

Should this agreement be terminated by either party, after three years continuous service, all renewal commissions on the 15 Year Fund Policy will cease whenever the total volume of the 15 Year Fund Policy in force on the books of the Company falls below the sum of $5,000,000.00.

This agreement applies to all 15 Year Fund Policies, and any other similar profit sharing policies, placed on the market by the Company, and the sale of same is supervised by you, so long as you are actively working for the Company. This agreement may be cancelled for a just cause by either, you or the Company, by giving 30 days written notice.

By January 26, 1953, petitioner was director, Expansion Department of Pioneer, and was in charge of contacting agents to sell the 15-year policy.

On March 1, 1953, petitioner's first-year commission on sales of the 15-year policy was increased to 100 percent of the first year's premiums, which was shared with the agent selling the policy and with the general agent in whose territory the policy was sold.

Under date of June 25, 1953, petitioner and Pioneer entered into an agreement which provided:

1. The Company does hereby appoint said Manager as its Manager of the Expansion Department for said Company in all the territory which the said Company is qualified to do business or in which it may hereafter become qualified, provided however, that said territory is hereby exclusively reserved to the Manager only in the following particulars, namely: that the said Manager shall have the exclusive right on the 15 Year Fund Policy, Form 202 and 308, except certain restricted territory in Alabama, which has already been agreed upon, and any other Special Policy developed by the Manager and written by the Company.

2. It is understood and agreed by and between the Company and the Manager that the Regular Agents and General Agents will be permitted to write the 15 Year Fund Policy and the Company shall enter into Special Agents' Agreements with Special Agents secured and trained by the Manager upon agreements which are approved by the Manager. Such Special Agents so employed shall be employees or Agents of the Company.

3. The total compensation of the Manager on the 15 Year Fund Policy shall be the sum of one hundred per cent (100%) of the first year premiums less the top first year commissions and override paid to the Agent, General Agent or trainer. The Manager shall receive 3% override renewal commission on premiums received the second to fifteenth year inclusive. If an Agent to whom the Company has advanced money and the advance was guaranteed by the Manager, leaves the services of the Company, the Manager will be credited with an additional 5% renewal commission on premiums received until the indebtedness is paid in full or until the 15th policy year, which ever first occurs. No renewal commissions shall be paid on that portion of the premiums deposited in the "Fund" each year.

4. The rates of commission on subsequent or different policies other than the 15 Year Fund Policy shall be agreed upon by and between the parties hereto by supplement to this agreement from time to time as such business shall be ready for sale through the Manager.

5. The Company shall have the right to terminate this agreement in the case of fraud, malfeasance, misappropriation or the withholding of funds by the Manager or his wilful neglect of any duty or obligation hereunder. The Company shall have the right to terminate this agreement in the event the business produced under the supervision of the Manager in any one year shall be less than $4,000,000.00.

6. The Company shall have the right to terminate this agreement in the event it shows evidence that the Manager has substantially violated any provisions of the law of any state or territory which are enforced or may hereafter be enacted regulating or pertaining to the business of the Manager as authorized under this agreement.

7. If this agreement is terminated for any reason the Manager will be paid first year and renewal commissions provided herein on all business written prior to the date of termination.

8. The Company reserves the right to, at any time, modify or cease to issue any policy now in use, or that may be added to those now in use by the Company, or to withdraw from the territory or any part of the territory in which the Company is operating on this date or may operate in the future, and the Manager hereby waives any claim from any loss or damage he may sustain by such action or actions on the part of the Company.

9. It is agreed that the Company will pay 50% of any legal expenses, agreed upon by the Manager and the Company, up to a total of $200.00 per month in obtaining the license or permission of the state insurance departments in the various states, to permit the sale of the 15 Year Fund Policy or other policies which are subsequently developed.

10. This agreement shall be binding upon and enure to the benefit of the parties, their successors, assigns, heirs and next of kin.

11. This agreement abrogates and renders void all previous agreements written or verbal, between the parties hereto; provided, however, that nothing herein contained shall be construed to affect or waive claims of any kind which the Company may have against the Manager or which the Manager may have against the Company under any previous agreement, except as herein specifically provided.

This agreement was supplemented three times to bring within its provisions policies which were variations of the 15-year policy conceived by petitioner.

Petitioner, as manager of a department of Pioneer, maintained his office at the home office of the company. His secretary's salary was paid by Pioneer although he supplemented the salary at one period. The expenses of maintaining the office were generally borne by Pioneer. However, petitioner incurred some expenses in promoting the sale of the 15-year policy for which Pioneer did not reimburse him. He had the authority to hire and to dismiss agents of Pioneer engaged in the sale of the policies which he devised, but this authority was not exclusive, and other executives could fire agents working under petitioner's direction. Petitioner had no authority to hire other employees for Pioneer.

In mid-1955, petitioner and other executives of Pioneer disagreed on various matters, and petitioner decided to become associated with another life insurance company as its vice president. He told Carter that he intended to leave Pioneer, and Carter, under date of June 1, 1955, wrote petitioner the following letter:

With reference to your statement to Mr. Earl W. Lebo and I that you have accepted an official position with Loyal American Life Insurance Company of Mobile, Alabama, and that you will be in full charge of agents and production

for this Company. We are therefore terminating your agreement as of this date.

You will, in accordance with the provisions of your agreement, be paid (1) Override Commissions on first year premiums received, on business written prior to the termination date, on policy forms specified in your agreement. (2) Renewal Commissions on renewal premiums received, on business written prior to the termination date, on policy forms specified in your agreement.

Any override commissions and renewal commissions due you in accordance with the above paragraph will be paid monthly as they accrue. We will consider a lump sum settlement at the end of this year. However, if we do not agree on an amount and if no lump sum settlement is made, you will continue to receive any override and renewal commissions due you on a monthly basis.

We have enjoyed having you associated with Pioneer Life and we wish you and your associates complete success in your new Company. If we can ever be of any service to you or your Company, please call upon us.

With kindest personal regards, * * *

Prior to petitioner's receipt of the foregoing letter he discussed with Lebo the termination of his association with Pioneer. He and Lebo considered the possibilities of his being paid a lump sum for his rights to renewal commissions, and Lebo told him that computation of the amounts of probable future commissions to which he was entitled would be difficult. After Carter wrote the letter, petitioner again discussed the matter with Lebo who assured him that until some lump-sum payment by Pioneer to him could be arranged, Pioneer would continue to pay him renewal commissions monthly.

After petitioner terminated his association with Pioneer, he continued to receive monthly payments from Pioneer representing renewal commissions on special policies. These payments were accompanied by statements setting forth computation of the commissions. Petitioner and Lebo discussed at various times after petitioner's termination of his contract with Pioneer the payment to petitioner of a lump sum in consideration for his release of his rights to receive renewal commissions, but no dollar amount for the value of petitioner's rights was determined.

Petitioner received from Pioneer commissions from the sales of special policies in the following amounts for the years 1954–58:

| Year | Commissions |
| --- | --- |
| 1954 | $61,163.57 |
| 1955 | 37,970.29 |
| 1956 | 13,627.35 |
| 1957 | 11,971.65 |
| 1958 | 10,427.81 |

He reported these commissions as ordinary income on his income tax returns for those years.

At a meeting of the board of directors of Pioneer of June 24, 1957,[1] Lebo reported that petitioner "was desirous of selling his contract to

---

[1] This date was recited by a witness; the exhibit filed did not recite a date. There would seem to be an unusually long interval between this date and the date the offer was accepted.

[Pioneer] on the basis of .60¢ on the dollar taking into consideration all business in force at the present time, without any provisions for future lapses." Lebo expressed the opinion that lapses on the special policies "would continue at the rate of at least 10% per annum" and that petitioner's offer was therefore unacceptable. The board adopted a resolution authorizing Carter and Lebo to offer petitioner ".30¢ on the dollar for future commissions on business presently in force."

Lebo made a computation of the estimated renewal commissions to which petitioner was entitled as of December 31, 1958. This computation was as follows:

*Analysis Made as of Dec. 31, 1958*

| Fund No. | Year of issue | Amount of insurance | Annual premiums | Commission rate | Number of years | Potential commission |
|---|---|---|---|---|---|---|
| | | | *15 yrs.* | | | |
| 383 A | 1954 | $13,960 | $455.00 | 3% × 10 = | | $136.50 |
| 383 A | 1955 | 734,713 | 18,436.32 | 3% × 11 = | | 6,083.99 |
| 383 A | 1956 | 21,020 | 503.75 | 3% × 12 = | | 181.35 |
| | | 769,693 | 19,395.07 | | | |
| | | | *20 yrs.* | | | |
| 369 | 1954 | 9,027 | 300.00 | 3% × 15 = | | 135.00 |
| 369 | 1955 | 329,304 | 11,550.00 | 3% × 16 = | | 5,544.00 |
| | | 338,331 | 11,850.00 | | | |
| 354 | 1954 | 2,024,213 | 67,370.20 | 3% × 15 = | | 30,316.59 |
| 354 | 1955 | 163,925 | 6,050.00 | 3% × 16 = | | 2,904.00 |
| 354 | 1956 | 20,000 | 271.60 | 3% × 17 = | | 138.52 |
| | | 2,208,138 | 73,691.80 | | | |
| | | | *15 yrs.* | | | |
| 202 | 1952 | 1,468,766 | 32,908.50 | 3% × 8 = | | 7,898.04 |
| 202 | 1953 | 5,207,626 | 118,031.27 | 3% × 9 = | | 31,868.44 |
| 202 | 1954 | 6,126,966 | 136,910.73 | 3% × 10 = | | 41,073.22 |
| 202 | 1955 | 3,071,303 | 68,564.00 | 3% × 11 = | | 22,626.12 |
| | | 15,874,661 | 356,414.50 | | | |
| Total | | 19,190,823 | 461,351.37 | | | 148,905.77 |

Pursuant to the action of the board of directors, Lebo offered petitioner the amount of $45,000 in discharge of Pioneer's obligation to pay petitioner renewal commissions. Petitioner accepted the offer. Pioneer paid petitioner the amount of $45,000 in 1959, and under date of March 31, 1959, petitioner and Pioneer entered into an agreement which provided as follows:

WHEREAS, first and second parties have heretofore entered into contracts pertaining to insurance, including but not limited to commissions on sales or policy of insurance and renewals thereof, expenses and fees, due or to become due to first party from second party, and such contracts have been modified, extended and changed from time to time; and,

WHEREAS, first party has proposed to second party that for the consideration hereinafter recited to be paid to first party by second party, first party will execute this release and discharge;

Now, THEREFORE, in consideration of the sum of FORTY FIVE THOUSAND DOLLARS ($45,000.00), paid by second party to first party, the receipt whereof is hereby acknowledged, first party does hereby release second party from any and all obligations, liabilities, claims or demands, matured or unmatured, known or unknown, arising by, or resulting from all contracts between the parties hereto, verbal or written, express or implied, which first party may now, or may ever, have arising or resulting from any such contract heretofore entered into between the parties, and it is the understanding and intent of this agreement and release that any and all contracts of any kind or character whatsoever now existing between the parties, whereby second party has been, is now, or may hereafter be, obligated, bound or liable to first party, and any and all claims, demands or liabilities past, present or future, that first party may have, hold or claim against second party are hereby cancelled, terminated and discharged, and such contracts are delivered and surrendered to second party.

Petitioner, on his Federal income tax return for 1959, reported the $45,000 received from Pioneer as gain from the sale of a capital asset, described as "Pioneer Life & Casualty Contract," acquired in 1952 and sold in 1959. Respondent determined that the amount of $45,000 received from Pioneer in 1959 constituted ordinary income to petitioner.

Petitioner at no time discussed with Carter or Lebo the formation of a partnership or joint venture between petitioner and Pioneer. No Federal partnership information return has ever been filed by petitioner and Pioneer. Petitioner has possessed various licenses to sell insurance, but he has never been licensed to engage in the insurance business in any State.

Petitioners and Pioneer were not associated during the period under review as partners or joint venturers.

OPINION

The only issue for decision is whether the amount of $45,000 received by petitioner from Pioneer in 1959 constituted long-term capital gain, as petitioner contends, or ordinary income, as respondent determined.

Petitioner, an experienced life insurance agent who had conceived a special 15-year life insurance, investment fund policy, became employed by Pioneer in 1952 and entered into a contract with Pioneer in 1953 whereby he was appointed manager of Pioneer's expansion department. Pioneer issued the policy devised by petitioner, and petitioner's duties as manager of the expansion department entailed generally the promotion of the policy and the recruiting and training of agents to sell the policy. Petitioner was to receive, as a commission, the first year's premiums on the policies, which was to be shared with agents selling the policies and with general agents in whose territories the policies were sold. He was also to receive renewal commissions from premiums paid on the policies after the first year. The contract provided that if the agreement was terminated peti-

tioner was to continue to receive commissions on business written prior to the date of termination. As of June 1, 1955, petitioner terminated the contract with Pioneer, gave up his position with the corporation, and thereafter had no contact with agents selling the policy or the variations of it which petitioner had also conceived.

After petitioner terminated the contract in 1955, he continued to receive payments from Pioneer. He testified that these payments included commissions from first-year premiums paid for the special policies sold after June 1, 1955, but we think he may have been mistaken in this testimony, and that the payments included only renewal commissions on policies sold before June 1955. Under his contract and the termination notice petitioner was not entitled to commissions on business written after termination of the contract, and there was no reason why petitioner, who performed no services after June 1, 1955, would have been paid a commission from the first-year premium on policies sold after he severed all connection with Pioneer and with the agents selling the policies. The special policy which petitioner had devised was not unique; it was merely a variation of other policies which were being written when petitioner conceived the idea of combining investment and life insurance features in a 15-year policy. Petitioner does not contend, and the evidence does not support the theory, that he had any property rights in the policy for which Pioneer would have had to compensate him. See and compare *Harold L. Regenstein*, 35 T.C. 183.

In any event, the evidence shows that petitioner was entitled only to renewal commissions when he entered into the settlement with Pioneer in 1959 and that Pioneer paid him solely for cancellation of his rights. Lebo calculated the amounts to which petitioner would be entitled after December 31, 1958 (if there were no lapses of the policies), to be $148,905.77. Lebo's computation is set forth in our findings.[2] Lebo had been authorized by Pioneer's board of directors to negotiate with petitioner to pay him 30 percent of the total commissions which might be payable to him in the future. In 1959 Lebo and petitioner arrived at a settlement by which petitioner was paid $45,000—an amount almost exactly 30 percent of the potential renewal commissions to which petitioner was entitled as calculated by Lebo.

We conclude, therefore, that the $45,000 paid petitioner by Pioneer in 1959 was an amount representing the negotiated present value of potential renewal commissions on the special policies negotiated prior to termination of petitioner's contract with Pioneer.

---

[2] Lebo was deceased at the time of the trial and no explanation was offered as to why his computations seemingly included a small amount of commissions on policies issued after June 1, 1955, contrary to the terms of the contract and termination notice. These amounts totaled only $319.87 and possibly represented renewal commissions on policies negotiated prior to termination of petitioner's contract but issued later.

In their petition petitioners alleged that the $45,000 was "realized from the sale of a contract which was a capital asset in their hands." On brief, however, petitioner's entire argument is directed to the proposition that petitioner and Pioneer were joint venturers, that petitioner sold his interest in the venture to Pioneer, and that the $45,000 he received in 1959 was taxable as an amount received upon the sale or exchange of an interest in a partnership.[3] The argument of petitioner is set forth on brief as follows:

Petitioner and Pioneer pooled their efforts to produce and sell certain rather unique insurance policies conceived of by petitioner. * * * Though perhaps unknown to them, they had, under the laws of Alabama, become joint adventurers in this enterprise, and, under the 1939 and 1954 Internal Revenue Codes, become partners for the purpose of taxation.

*     *     *     *     *     *     *

On June 1, 1955, petitioner sold his interest in the venture to Pioneer, receiving in exchange a right to share in premium income realized on future sales of the special policy. The special policies were sold after this date and on into 1956, and petitioner received the specified payment in respect of such premium income. He also continued to receive payment on the premium income from the policies sold when he had been a joint adventurer.

On March 31, 1959, petitioner received $45,000 from Pioneer in exchange for all rights to future payment. However, these rights, to the extent he had become entitled to them after March 9, 1954, and while a tax partner, constituted "unrealized receivables" under section 751 of the 1954 Code, and, under section 735(a)(1) of such Code, did not produce long-term capital gain. To the extent of these receivables, which had a value of $18,000 on March 31, 1959, petitioner should not have taken the deduction for long-term capital gains.

Under petitioner's view of the case, as we understand the argument, he and Pioneer associated in 1952 in a joint venture which existed until June 1, 1955; this joint venture, by virtue of section 3797(a)(2) of the Code of 1939 and section 761 of the Code of 1954, must be deemed a partnership for income tax purposes, and petitioner and Pioneer must be treated as partners; petitioner sold to Pioneer on June 1, 1955, his interest in the joint venture, receiving therefor the right to share in premium income from special policies sold after that date; on March 31, 1959, he sold, for $45,000, payment rights to which he became entitled when he was a "partner" and other payment rights based on policies sold after he ceased being a "partner"; the amount of $18,000 of the total selling price must be allocated to "payment rights" resulting from policies sold between March 9, 1954 (the effective date of

---

[3] SEC. 751 [I.R.C. 1954].

(a) SALE OR EXCHANGE OF INTEREST IN PARTNERSHIP.—The amount of any money, or the fair market value of any property, received by a transferor partner in exchange for all or a part of his interest in the partnership attributable to—

(1) unrealized receivables of the partnership, or

(2) inventory items of the partnership which have appreciated substantially in value, shall be considered as an amount realized from the sale or exchange of property other than a capital asset.

section 735), and June 1, 1955, and is ordinary income because it results from the sale of unrealized receivables; and, finally, the remaining portion of the $45,000 must be allocated to other payment rights which were not unrealized receivables and constitutes capital gain.

We think that petitioner's argument, founded as it is on the premise that petitioner and Pioneer were engaged in a joint venture, contorts the facts, and we do not necessarily agree with petitioner's conclusions even if his premise be granted. But it is clear that petitioner and Pioneer were not joint venturers.

In *Beck Chemical Equipment Corporation*, 27 T.C. 840, extensive consideration was given to the issue of whether the petitioner had associated with another party in a joint venture during the year in controversy. We said (pp. 848, 849):

The legal relationship known as a joint venture has been defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation," and also as "an association of persons to carry out a single business enterprise for profit." * * *

Whether parties have formed a joint venture is a question of fact to be determined by reference to the same principles that govern the question of whether persons have formed a partnership which is to be accorded recognition for tax purposes. *Smith's Estate* v. *Commissioner*, 313 F. 2d 724, affirming on this issue 33 T.C. 465; *Beck Chemical Equipment Corporation*, *supra*. Therefore, while all circumstances are to be considered, the essential question is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise. See *Commissioner* v. *Culbertson*, 337 U.S. 733.

We are not convinced by petitioner's argument that he and Pioneer were joint venturers under Alabama law even though they were unaware of the relationship. But, in any event, their status under local law would not be determinative, since the Internal Revenue Code prescribes its own standards for qualification of an unincorporated association as a partnership and supersedes local law. *Beck Chemical Equipment Corporation*, *supra*. Cf. *Nellie Russo Linsenmeyer*, 25 T.C. 1126. However, it is relevant in deciding whether Pioneer did enter into the joint venture for the issuance of the special policies, that petitioner was not licensed or authorized to underwrite insurance or to engage in the insurance business except as an agent selling policies.

The following factors, none of which is conclusive, bear on the issue, *Smith's Estate* v. *Commissioner*, *supra; Beck Chemical Equipment Corporation*, *supra:* The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has

made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

The contract between Pioneer and petitioner is unambiguous; it was an employment contract by which petitioner was hired by Pioneer in an executive capacity to recruit and supervise agents to sell the special policies, and he was to receive commissions from sales in return for his services. The agents were to be employees of Pioneer, not of petitioner or of any joint venture or other association. The parties' conduct with respect to the terms of the contract was consistent with its clear import. See *Arthur N. Blum*, 11 T.C. 101, affd. 183 F. 2d 281. Petitioner indicated in his testimony that he was an employee of Pioneer. Carter testified that, in negotiating the contract with petitioner, a partnership was never discussed or contemplated, and implicit in his testimony is the fact that petitioner was considered an employee of Pioneer. Petitioner was furnished an office at Pioneer's headquarters as would have been any executive employee.

Profits from the policies would have resulted from two sources: (1) Underwriting profits for life insurance features of the policies; and (2) a share of gains and profits from the investment accounts established with a portion of the premiums paid. Pioneer was to receive 10 percent of the latter gains and profits at the end of the contract term as its compensation for managing the account. Of course, petitioner in no manner shared in these profits, nor did he have anything to do with the funds held by Pioneer. He was not to share losses.

Petitioner had no control over, or responsibility with respect to, the issuance of the special policies. He had no proprietary interest in the net profits from issuance of the policies or from investment of premiums.

There is no evidence that petitioner and Pioneer ever held themselves out as joint venturers. No Federal partnership returns were ever filed for the purported joint venture, and apparently neither party represented to respondent that a joint venture existed. In fact, we conclude that the notion that petitioner and Pioneer formed a joint venture is an afterthought. Undeniably, neither party considered during the period involved that a joint venture had been established.

We conclude that petitioner and Pioneer were not partners or joint venturers and that no part of the $45,000 paid to petitioner was for the sale or exchange of an interest in a partnership. This conclusion obviates the necessity of discussing other phases of petitioner's rather complicated argument on brief.

Although petitioners made no argument on brief in support of the position they took in the pleadings, i.e., that they sold a contract which was a capital asset in their hands, we deem it appropriate to consider this proposition briefly, because if the $45,000 involved represented gain from the sale or exchange of a capital asset, petitioners are entitled to have it taxed as capital gains. Secs. 1221 and 1222, I.R.C. 1954. But in our opinion petitioner's contract with Pioneer was not a capital asset; neither did he sell it to Pioneer in 1959.

Petitioner's contract and the termination notice gave petitioner the right to compensation in the future for services rendered in the past. The contract gave petitioner no right to commissions on business written after his services were terminated. A right to future compensation for services performed in the past, even if secured by contract, does not constitute a capital asset in the hands of the taxpayer who has performed the services, *Nat Holt*, 35 T.C. 588, affd. 303 F. 2d 687; *Joseph W. Brown*, 40 T.C. 861, since the taxpayer's rights—despite that in their totality they may be deemed "property"—represent only the taxpayer's claim to amounts which would be ordinary income to him as received. See *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260. It follows that an amount paid as consideration for the relinquishment of such rights is not gain from the conversion of a capital investment and is not within the intendment of the statutory provisions prescribing capital gains treatment. See *Nat Holt, supra; Harold L. Regenstein, supra*. Here, as in the *Holt* case, the amount received by petitioner was no more than a "fixed amount * * * received in lieu of the right to receive a somewhat indefinite, although reasonably ascertainable, amount in the future for services rendered in the past. As such it was income and not consideration for the sale or exchange of a capital asset." *Nat Holt, supra* at 599.

Also, petitioner sold Pioneer nothing in 1959. He simply settled for a lump-sum payment his claim for commissions to be paid in the future. His rights did not survive the settlement; together with Pioneer's obligations they were merely extinguished. He sold neither goodwill nor assets in the nature of goodwill, such as insurance expirations. Cf. *Edward A. Kenney*, 37 T.C. 1161. Such a transaction was not a sale because it did not involve the transfer of property. *Marc D. Leh*, 27 T.C. 892, affd. 260 F. 2d 489.

We conclude that the $45,000 paid to petitioner by Pioneer in 1959 was taxable to petitioners as ordinary income.

*Decision will be entered for the respondent.*