T.C. Memo. 2018-102

UNITED STATES TAX COURT

MARC WHITE AND KELLY WHITE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10181-15.                          Filed July 3, 2018.

<u>Betty J. Williams</u>, <u>Richard T. Luoma</u>, and <u>Matthew D. Carlson</u>, for petitioners.

<u>Nicholas R. Rosado</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>:  In a notice of deficiency dated March 24, 2015, respondent determined the following deficiencies, additions to tax, and penalties:[1]

_____

[1] Unless otherwise indicated, all section references are to the Internal

(continued...)

[*2]

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|------|-----------|----------------------------------|----------------------|
| 2011 | $84,179 | -0- | $16,836 |
| 2012 | 46,951 | $11,738 | 9,390 |

After concessions,[2] the issues for decision are: (1) whether petitioners' business constituted a partnership for tax purposes; (2) whether petitioners had unreported gross receipts for the 2011 and 2012 tax years; and (3) whether petitioners are entitled to deduct expenses reported on Schedules C, Profit or Loss From Business, for the 2011 and 2012 tax years.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in California when they timely filed their petition. They were married and filed joint Federal income tax returns for the taxable years at issue.

_____

[1](...continued)
Revenue Code of 1986, as amended and in effect for the years at issue. Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2] On brief petitioners conceded "the remaining adjustments to Schedule C expenses [apart from advertising expenses and rent expenses], itemized deductions, pension and annuity income, computational adjustments, and additions to tax and penalties (to the extent of any deficiencies)."

**[*3]** I. <u>Background</u>

Petitioner Marc White spent most of his career in automobile sales. He was employed by the Mercedes Benz dealership in Sacramento, California, for over 20 years, ultimately serving as the manager of the dealership. Towards the end of 2010 after losing his position with Mercedes Benz, Mr. White was approached by his ex-wife April Van Patten about forming a mortgage company. Mrs. Van Patten and her husband Kevin Van Patten had experience in real estate, and Mrs. Van Patten held a real estate broker license in California and also held a mortgage lending originator license regulated by the National Mortgage Licensing System. Mr. White observed the Van Pattens' success in real estate and believed real estate and mortgage lending to be a profitable business.

II. <u>Business Formation</u>

Mr. White and Mrs. Van Patten, along with their respective spouses-- petitioner Kelly White and Mr. Van Patten--ultimately agreed to work together in the real estate business in late 2010 or early 2011. This business had two separate components under two separate names: Mortgage Lending Services of California was the mortgage lending business, and Homebuyers Resource Center was the real estate transaction business. Its business address was 7996 California Avenue

[*4] Suite C, Fair Oaks, California 95628 (Fair Oaks address). The couples did not reduce the terms of their business relationship to writing.

A. Capitalization

During the 2011 tax year petitioners withdrew $211,746 from Mr. White's retirement account. Petitioners used a substantial part of this distribution to support the new business. The Van Pattens did not make similar financial contributions to the business. While Mr. Van Patten testified that he also made capital contributions to the business, we do not find his testimony credible. When Mr. White was asked what contributions the Van Pattens made, he responded: "I mean, they really didn't have any money, I mean, to speak of when we all partnered up." We found his testimony on this point more credible than Mr. Van Patten's.

B. Bank Accounts

Petitioners' personal checking account with Golden 1 Credit Union was used for the business' banking during the first few months of operation. The Van Pattens explained to Mr. White that they had had problems with bad checks in a prior business and could not open business bank accounts. However, as we discuss below in Section IV, the record includes a check written on a Bank of America account listing Camille Straughn "DBA The Van Patten Group" dated

**[*5]** June 24, 2011, and a check dated November 30, 2012, written on a TD Ameritrade account listing Mrs. Van Patten "DBA Mortgage Lending Services of California (a Sole Proprietorship)" at the Fair Oaks address.

On November 2, 2010, three bank accounts were opened with Bank of America: a personal checking account ending in 5398, opened under Mr. and Mrs. White's names; a business savings account ending in 3053; and a business checking account ending in 3906. Records of both business bank accounts listed "Mortgage Lending Services of California" as the account title and "corporation" as its legal designation. Three signatories were authorized for the two business accounts: Mr. White as president, Mrs. White as treasurer, and Camille Straughn as secretary. On December 2, 2010, Mr. White opened a fourth bank account with Bank of America: a business checking account ending in 3381. Mr. White was the only officer listed on the account--as president and secretary.

After the Bank of America accounts were opened, a bad check was written on one of the business accounts and the business was unable to satisfy the financial obligations on that account. On October 6, 2011, Mr. White opened three new business accounts with American River Bank: a business checking account ending in 8711 opened under Mr. White DBA Mortgage Lending Services of CA; a business checking account ending in 8728 opened under Mr. White DBA

**[*6]** Homebuyers Resource Center; and a business checking account ending in 8735 opened under Mr. White DBA Mortgage Lending Services--Trust Account. The American River Bank account agreements each list Mr. White as the sole signatory, and the business designation selected for each account was "Sole Proprietorship" with Mr. White listed as the sole proprietor.

III.  Business Operations

A.  Responsibilities

The two couples had different roles and responsibilities.  Mr. White oversaw office operations.  Mrs. White oversaw the real estate agents, followed up on agents' leads, tracked agents' progress in showing homes, and wrote offers. She also satisfied the requirements necessary to re-establish her real estate license.[3]  Following the reestablishment of her license, she served as a real estate agent, providing backup support for the other real estate agents and helping show properties herself.  Mrs. Van Patten served as the broker of record because she held the required professional licenses.  Finally, Mr. Van Patten was responsible for marketing, structuring loans, and overseeing loan processing.

---

[3] At trial respondent orally moved for the Court to take judicial notice of the fact that Mrs. White had a salesperson license issued in 2003 that did not expire until 2015.  Petitioners do not object to a finding that Mrs. White obtained her license in 2003.  We, therefore, find this fact conceded and will deny as moot respondent's oral motion to take judicial notice.

[*7]    B.  Financial Activities

The business was run very informally.  The couples did not consult or employ any tax professionals.  While for a time they did employ a bookkeeper, who used QuickBooks software to maintain the company's books and records, as business declined they were unable to pay the bookkeeper.  Those Quickbooks files were no longer accessible, and petitioners did not call the bookkeeper to testify at trial.

The business incurred advertising expenses at its inception.  Mr. Van Patten ordered 25,000 mailers from A-Applied Mailing Service, Inc., to advertise the refinancing and home mortgage lending services and paid $10,228 for their printing, packaging, and mailing.  Mr. White then reimbursed Mr. Van Patten with funds withdrawn from his Golden 1 Credit Union account.  The record includes a summary for 2011, prepared by Mrs. White during petitioners' audit, titled "Rent-- Other Business Property".  That summary includes the following items:  $27,450 for office rent, $3,500 for office furniture, $2,463 for "maintenance", $537 for business technology, and $450 for new office deposit.

    C.  Division of Profits

Petitioners controlled the business' funds, used business accounts to pay personal expenses and personal accounts to pay business expenses, and did not

[*8] maintain books and records tracking these payments. They also used funds from the business accounts to pay expenses for the Van Pattens--such as utility bills and car payments--but the record does not include reliable evidence showing how much they paid, with one exception discussed below.

While petitioners argue that the couples agreed to an equal division of profits, Mr. White acknowledged at trial that this did not occur. The record shows irregular cash withdrawals by petitioners and some payments to the Van Pattens along with commission payments and "draws" to other associates. These cash withdrawals exceed the documented payments to, or on behalf of, the Van Pattens.

During the tax years at issue petitioners made most of the mortgage payments for the house where the Van Pattens lived. At trial Mr. White explained the arrangement with the Van Pattens as follows:

> We had a verbal agreement. The house was in my name. I moved out
> of the house because they really wanted to live there, because they
> had a big family. So I moved out. I moved into a different house.
> And because their credit was bad, I had a verbal agreement that, if
> they would pay the mortgage on it until they got squared away and
> could get good credit, that they had to pay me, but that I would take--
> you know, we--together, however you want to look at it, we were
> partners. And then, once their credit got good and they got squared
> away, they would take over the mortgage on the house when they
> could actually qualify for it.

**[*9]** Petitioners claimed deductions for mortgage interest paid on the home in which the Van Pattens lived during both taxable years at issue.

As petitioners' financial situation deteriorated, the lines between business accounts and personal accounts were blurred even further. Mr. White described the financial difficulties he faced, testifying: "I made payments from every account I had before I went bankrupt. I grabbed money from any place that -- * * * I took money out of everywhere."

The business was never incorporated, was never profitable, and ultimately failed. Towards the end of 2012 the couples agreed to part ways, and the Van Pattens agreed to buy petitioners' interests in the business.

IV.  Income Tax Returns

Petitioners filed joint Forms 1040, U.S. Individual Income Tax Return, for 2011 and 2012. Petitioners timely filed their 2011 Form 1040 and filed their 2012 Form 1040 on May 23, 2014.

Mr. Van Patten prepared petitioners' Forms 1040 for 2011 and 2012 although the returns indicate that they were self-prepared. Mr. Van Patten also prepared the joint Forms 1040 he filed with Mrs. Van Patten. Mr. Van Patten was not a tax professional and did not have a tax background.

[*10] Both couples reported business income on Schedules C for the tax years at issue as described below. No Form 1065, U.S. Return of Partnership Income, was ever filed for the business.

Petitioners attached Schedules C and Schedules C-EZ, Net Profit From Business, to their 2011 and 2012 Forms 1040. The Schedules C related to Mr. White's shares of the business income and expenses, and the Schedules C-EZ related to Mrs. White's shares. On their 2011 Schedule C, petitioners reported $367,758 of income and claimed deductions of $32,698 for advertising expenses and $34,200 for rent expenses. Petitioners also reported $6,807 of income on their 2011 Schedule C-EZ. Petitioners reported $320,310 of income on their 2012 Schedule C and $28,407 of income on their 2012 Schedule C-EZ.

The Van Pattens reported $48,617 of income for Mr. Van Patten's "Real Estate Marketing" activities and $245,102 of income for Mrs. Van Patten's "Real Estate" activities on their 2011 Schedules C. On their 2012 Schedules C the Van Pattens reported $46,676 of income for Mr. Van Patten's business activities and $292,937 of income for Mrs. Van Patten's business activities.

Mrs. Van Patten's 2011 Wage and Income Transcript indicates that she was issued six Forms 1099-MISC, Miscellaneous Income, related to her real estate activities which were sent to the Fair Oaks address: five Forms 1099-MISC were

**[*11]** issued to her, and one was issued to her on behalf of Mortgage Lending Services of California. Mrs. Van Patten's 2012 Wage and Income Transcript indicates that she was issued four Forms 1099-MISC related to her real estate activities and sent to the Fair Oaks address: two Forms 1099-MISC were issued to her, one was issued to her on behalf of Homebuyers Resource Center, and one was issued to her on behalf of Mortgage Lending Services.

Petitioners did not reconcile Mrs. Van Patten's Forms 1099-MISC with their business gross receipts. Nor could we. We could identify only two Form 1099-MISC payors from Mrs. Van Patten's Wage and Income Transcript in respondent's bank deposits analysis. We could not reconcile the deposits with the bank statements in the record. The gross receipts the Van Pattens reported on their Schedules C exceeded the total gross receipts reported to Mrs. Van Patten on her Forms 1099-MISC. Finally, petitioners never explained how the payments reported to Mrs. Van Patten were transferred to the business. The record does include two checks that may have represented transfers. The first check, dated June 24, 2011, of $4,100 was made out to Mortgage Lending Services and was issued by a Bank of America bank account held by Camille Straughn "DBA The Van Patten Group". The second check, dated November 30, 2012, of $6,000 was made out to Mr. White and was issued by a TD Ameritrade bank account held by

[*12] Mrs. Van Patten "DBA Mortgage Lending Services of California (a Sole Proprietorship)" at the Fair Oaks address.[4]

V.  Unreported Income

Respondent initially summoned petitioners' bank records from their Bank of America and American River Bank accounts.  While reviewing these bank records, respondent identified transfers to petitioners' Golden 1 Credit Union account and subsequently summoned petitioners' bank records from this account. Respondent began a bank deposits analysis to compute petitioners' income but was unable to complete it given the incomplete bank account records received.  As a result, respondent used the specific-item method for 2011 and 2012 to reconstruct petitioners' income.  Respondent determined and classified deposit sources from the descriptions of deposited items on petitioners' account records. Respondent then excluded as nontaxable all transfers between bank accounts and excluded rental payments, pension distributions, or unemployment compensation. Respondent also excluded as nontaxable all cash deposits, given the nature of petitioners' businesses.  Finally, respondent excluded as nontaxable deposits from

_____

[4] Given the timing this check also may have been the Van Pattens' payment to petitioners for the business.

**[\*13]** the Van Pattens that petitioners indicated to the revenue agent were loan repayments.

Respondent determined that petitioners' deposits totaled $786,881 for 2011 and $766,761 for 2012. As a result of the specific-item method reconstruction, respondent determined that petitioners had unreported Schedule C gross receipts of $42,985 for 2011 and $121,053 for 2012.

OPINION

## I. Burden of Proof

The taxpayer generally has the burden of proving that the Commissioner's determinations in a notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), rev'g, 67 T.C. 672 (1977).[5]

_____

[5] Petitioners assert that they have provided complete and conclusive documentation and credible testimony to substantiate their income and claimed deductions sufficiently to shift the burden of proof under sec. 7491(a). Under sec. 7491(a)(1), "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue." See Higbee v. Commissioner, 116 T.C. 438, 442 (2001) ("Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness.)" (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995)). We do not believe petitioners have

(continued...)

**[*14]** II.  <u>Unreported Income</u>

Section 61(a) provides that gross income includes "all income from whatever source derived".  <u>See</u> <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 430-432 (1955).  A taxpayer is responsible for maintaining adequate books and records sufficient to establish the amount of his or her income.  <u>See</u> sec. 6001. If a taxpayer fails to maintain and produce the required books and records, the Commissioner may determine the taxpayer's income by any method that clearly reflects income.  <u>See</u> sec. 446(b); <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 693 (1989); sec. 1.446-1(b)(1), Income Tax Regs.  The Commissioner's reconstruction of income "need only be reasonable in light of all surrounding facts and circumstances."  <u>Petzoldt v. Commissioner</u>, 92 T.C. at 687.

A.  <u>The Specific-Item Method</u>

The specific-item method is a method of income reconstruction that consists of evidence of specific amounts of income received by a taxpayer and not reported

---

[5](...continued)
satisfied the requirements for the burden to shift to respondent.  Moreover, for issues we resolve on a preponderance of the evidence in the record, which party bears the burden is not relevant; it is relevant only where there is an evidentiary tie.  <u>See</u> <u>Knudsen v. Commissioner</u>, 131 T.C. 185, 189 (2008); <u>Schank v. Commissioner</u>, T.C. Memo. 2015-235, at *16.

[*15] on the taxpayer's return. See Estate of Beck v. Commissioner, 56 T.C. 297, 353, 361 (1971).

Petitioners failed to maintain accurate books and records for the years at issue. Respondent, therefore, was justified in using the specific-item method to determine petitioners' tax liabilities for the years at issue. See id. at 353-354. Petitioners do not argue that the gross receipts computed by respondent are from nontaxable sources. Instead, petitioners assert that the gross receipts were the revenue of a partnership and should have been split among the partners. We, therefore, must determine whether the couples' business constituted a partnership during the tax years at issue. Petitioners further argue that because business profits should have been split, the gross receipts petitioners reported on their returns were overstated and should be adjusted downward, not upward, to account for the amounts attributable to the Van Pattens and reported on the Van Pattens' Schedules C for these years.

B. Existence of Partnership

If, as petitioners assert, the couples' business was properly classified as a partnership for tax purposes, petitioners would be taxable on only their distributive shares of the partnership's income. See secs. 702, 704(a) ("A partner's distributive share of income, gain, loss, deduction, or credit shall, except

**[*16]** as otherwise provided in this chapter, be determined by the partnership agreement.").

Federal tax law controls the classification of "partners" and "partnerships" for Federal tax purposes. <u>See</u> sec. 301.7701-1(a), Proced. & Admin. Regs.; <u>see also</u> <u>Commissioner v. Tower</u>, 327 U.S. 280, 288, 290 (1946). A partnership is a business entity with two or more parties. <u>See</u> secs. 301.7701-1(a)(1), 301.7701-3(a) and (b)(1)(i), Proced. & Admin. Regs. The hallmark of a partnership is that "the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom." Sec. 301.7701-1(a)(2), Proced. & Admin. Regs. In determining whether a partnership exists, the Court considers the following factors:

[(1)] The agreement of the parties and their conduct in executing its terms;
[(2)] the contributions, if any, which each party has made to the venture;
[(3)] the parties' control over income and capital and the right of each to make withdrawals;
[(4)] whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income;
[(5)] whether business was conducted in the joint names of the parties;

**[*17]** [(6)] whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers;

[(7)] whether separate books of account were maintained for the venture; and

[(8)] whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964). Whether parties have formed a partnership is a question of fact, and while all circumstances are to be considered, the "essential question is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise." Id. We will address each factor in turn.

## 1. Agreement of Parties and Conduct in Executing Terms

Petitioners and the Van Pattens did not reduce the terms of their agreement to writing. A partnership agreement may be entirely oral and informal, but the parties must demonstrate that they complied with its terms. See Strickland v. Commissioner, T.C. Memo. 1986-85 (finding that a partnership existed even though no written agreement existed during the years at issue) (citing Ayrton Metal Co. v. Commissioner, 299 F.2d 741, 742 (2d Cir. 1962), and Seattle Renton Lumber Co. v. United States, 135 F.2d 989, 991 (9th Cir. 1943)).

While the couples may have agreed orally to an equal division of profits, Mr. White acknowledged that this division did not occur. Unlike the taxpayers in

**[*18]** <u>Strickland</u>, petitioners withdrew varying sums of money from the business at irregular intervals. See <u>Azimzadeh v. Commissioner</u>, T.C. Memo. 2013-169, at *7. The Van Pattens could not withdraw money directly but instead received irregular payments in amounts different from the withdrawals and payments by petitioners. Nor can we count petitioners' mortgage payments for the home occupied by the Van Pattens as evidence of the Van Pattens' right to partnership profits. While petitioners argue that the Van Pattens owned the home, petitioners deducted the interest payments on their own joint Forms 1040.

Petitioners direct us to the Van Pattens' returns to show that the Van Pattens already reported their shares of the business income. Petitioners, however, never established that the Van Pattens did not receive income from other sources. Moreover, petitioners never explained how payments reported on the Van Pattens' Forms 1040 (and on Forms 1099-MISC issued to Mrs. Van Patten) made their way into the business bank accounts or were accounted for otherwise. This factor, therefore, weighs against finding that a partnership existed.

### 2. Parties' Contributions to Venture

We found above that petitioners withdrew $211,746 from Mr. White's IRA and used these funds, in part, to capitalize the business, but we have no credible evidence that the Van Pattens made any capital contributions. See <u>Holdner v.</u>

**[\*19]** <u>Commissioner</u>, T.C. Memo. 2010-175, 2010 WL 3036440, at \*12, <u>aff'd</u>, 483 F. App'x 383 (9th Cir. 2012). The record suggests that petitioners and the Van Pattens each performed services related to the business, however. We, therefore, will weigh this factor as favorable. <u>See</u> <u>Simmons v. Commissioner</u>, 22 B.T.A. 1106, 1114 (1931); <u>Wheeler v. Commissioner</u>, T.C. Memo. 1978-208.

### 3. Control Over Income and Right To Make Withdrawals

Petitioners argue that the Van Pattens had equal rights to withdraw funds from the accounts, but the credible evidence before us indicates that petitioners had sole financial control. Petitioners were the signatories on all of the business accounts throughout the business' existence; the Van Pattens never were. We also note that while Camille Straughn also had signature authority for one of the initial accounts, nowhere in the record do petitioners allege that Ms. Straughn was acting on behalf of the Van Pattens. While the record shows that petitioners made payments to or on behalf of the Van Pattens, no evidence shows that the Van Pattens had rights to withdraw funds from the accounts aside from Mr. White's testimony that the Van Pattens had debit cards. But the account statements do not indicate who made withdrawals, nor did petitioners tie any specific expenditures to the Van Pattens. While, as we note above, the Van Pattens received some payments related to the business, and petitioners paid the mortgage for the Van

**[\*20]** Pattens at least for part of the years at issue, this evidence is not enough for us to conclude that the Van Pattens had joint control over the business' income. This factor, therefore, weighs against finding a partnership existed.

### 4. Coproprietor or Nonpartner Relationship

Respondent asserts that the Van Pattens had a separate business and were independent contractors who were paid commissions. Petitioners assert that the compensation of the couples was contingent on the proceeds from the business and they did not have fixed salaries.

The record indicates that the Van Pattens played a role in the business, but the evidence is not sufficient to show that their role was coproprietors rather than independent contractors. Business owners, for example, may agree to compensate key employees with a percentage of business income, or brokers may be retained to sell property for a commission based on the net or gross sale price. See Comtek Expositions, Inc. v. Commissioner, T.C. Memo. 2003-135, aff'd, 99 F. App'x 343 (2d Cir. 2004). Although these arrangements may result in a division of profits, neither constitutes a partnership unless the parties become coproprietors. Id. Indeed, in Luna v. Commissioner, 42 T.C. at 1079, we held that no partnership existed even though the taxpayer was to receive percentage commissions in exchange for the management services he provided. The record shows that

[*21] payments to independent contractors were labeled commission payments and draws, like payments made to the Van Pattens. The only evidence that the Van Pattens received payments more akin to a partner's share than an independent contractor's commission or draw is petitioners' and the Van Pattens' uncorroborated testimony. We do not find their story credible. This factor, therefore, weighs against finding a partnership.

### 5. Whether Business Was Conducted in Joint Names

As the business' bank records reflect, the accounts were held in either Mr. White's name alone or petitioners' names together and included the names of the businesses. The Van Pattens were not listed on any of the accounts. Further, petitioners designated the business as either a sole proprietorship or a corporation, not a partnership. And it appears that the Van Pattens had separate business bank accounts. Mrs. Van Patten's check showed "April Lynn Van Patten DBA Mortgage Lending Services of California (a Sole Proprietorship)" at the Fair Oaks address at least at some point in the business relationship. And another check to Mortgage Lending Services lists Camille Straughn "DBA The Van Patten Group". These checks suggest that the couples both treated the business as their own sole proprietorships--not a joint enterprise--not just on their Forms 1040, but also to

[*22] financial institutions (and potentially check recipients). This factor, therefore, weighs against finding a partnership existed.

6. Filing of Partnership Returns or Representation of Joint Venture

As petitioners acknowledge, they did not prepare and file a Form 1065 for their business for either taxable year at issue. Instead, they reported the income and expenses on their Schedules C and C-EZ. Petitioners assert that they represented to others that they were joint venturers and informed respondent during their examination that they operated a partnership. Respondent disputes this characterization, alleging that petitioners characterized transfers from the Van Pattens as loan repayments. We need not resolve this dispute. Petitioners' uncorroborated testimony cannot overcome their reporting of income and expenses on their returns and the bank account records in evidence. We find, therefore, that this factor weighs against finding a partnership.

7. Maintenance of Separate Books and Accounts

Petitioners contend that they used QuickBooks to maintain separate books and records at the entity level. Petitioners failed to produce any evidence that separate books and accounts were maintained other than their uncorroborated testimony. The business bank accounts were held in petitioners' names (either Mr. White or both Mr. and Mrs. White). Petitioners also admit that they used business

**[*23]** accounts for personal expenses and personal accounts for business expenses. This factor, therefore, weighs against finding that a partnership existed.

        8. <u>Exercise of Mutual Control and Assumption of Mutual Responsibilities</u>

Petitioners and the Van Pattens testified that they each assumed separate roles in the real estate and mortgage activities, and the record supports a finding that they had a business relationship in which they had different roles. But the fact that they may have performed separate functions does not convince us that they exercised "mutual control" and "mutual responsibilities" indicative of a partnership, notwithstanding their conclusory testimony. <u>See</u> <u>Kazdin v. Commissioner</u>, T.C. Memo. 1969-75.

Considering the record as a whole, applying the <u>Luna</u> factors, and considering the inconsistencies in the record, we conclude that the business is not properly classified as a partnership for tax purposes. While the record indicates that petitioners and the Van Pattens had some sort of relationship, the record does not support a conclusion that the business was a partnership. Petitioners' explanations for the inconsistencies between their story and the evidence have far too many gaps. We understand that petitioners were trying to make ends meet in a

[*24] challenging time, but their story cannot survive all of the gaps and inconsistencies in the record without credible evidence to back them up.

Moreover, even were we to conclude that a partnership existed, we have no reliable evidence of the partnership's total receipts on which we could base an allocation of income different from the amounts respondent calculated using the specific-item method. We, therefore, hold that petitioners have unreported Schedule C gross receipts of $42,985 and $121,053 for the 2011 and 2012 taxable years, respectively.

III. Deductions

Deductions are a matter of legislative grace, and a taxpayer must prove his or her entitlement to deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers, therefore, are required to substantiate expenses underlying each claimed deduction by maintaining records sufficient to establish the amount of the deduction and to enable the Commissioner to determine the correct tax liability. Sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001). Under the Cohan rule, where a taxpayer is able to demonstrate that he or she has paid or incurred a deductible expense but cannot substantiate the precise amount, the Court may estimate the amount of the expense if the taxpayer produces credible evidence

[*25] providing a basis for the Court to do so. Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930).

Section 162(a) provides that expenses are deductible if they were ordinary, necessary, and paid or incurred during the tax year and were directly connected with, or proximately resulted from, a trade or business of the taxpayer. See Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971); Kornhauser v. United States, 276 U.S. 145, 153 (1928); O'Malley v. Commissioner, 91 T.C. 352, 361-362 (1988).

A. Advertising Expense

Petitioners assert that they are entitled to a $10,228 advertising expense deduction for the 2011 tax year. Mr. White credibly testified that the $10,228 expense relates to an advertising mailer designed to promote the new business. Respondent argues that the expense was not for petitioners' business. The record includes a copy of the original invoice and a corresponding debit on an account statement from petitioners' Golden 1 bank account--the account initially used for business expenses--and supports Mr. White's testimony. We reject respondent's argument that these expenses were the Van Pattens'.

Having found that the bank account was solely for petitioners' business and that the business was not a partnership, we logically find that petitioners may

[*26] deduct the advertising expense incurred by the business. We also find that petitioners substantiated this expense and proved that it was ordinary and necessary to their business.

We hold, therefore, that petitioners are entitled to deduct $10,228 of advertising expenses for the 2011 tax year.

B. Rent Expense

Petitioners assert that they are entitled to deduct $34,400 in rent expenses for the 2011 taxable year. Respondent allowed a deduction for $27,900 of rent expenses and claims that this amount is greater than the amount of rent payments shown on the summary prepared by Mrs. White of $27,450. We agree with respondent that petitioners are not entitled to a greater amount. Petitioners did not show that the remaining expenses described on Mrs. White's summary as maintenance, business technology, new office deposit, and office furniture are rent expenses for the 2011 taxable year; nor did they provide documentation that would support deductibility as another type of business expense.

We hold, therefore, that petitioners are entitled only to the $27,900 rent expense deduction respondent allowed on their 2011 joint return.

[*27] We have considered all of the arguments made by petitioners and respondent and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

An appropriate order will be issued, and decision will be entered under Rule 155.